STATE v. B. W. BARKSDALE.

(Filed 7 June, 1921.)

1. **Statutes— Interpretations— Intent— Spirituous Liquors—Intoxicating Liquors.**

The various parts of a statute on the same subject are construed as a whole, to give each and every part effect, if this can be done by any fair and reasonable intendment; and when a literal interpretation of the language will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law will control.

2. **Spirituous Liquors—Intoxicating Liquors—Statutes—Interpretation— Amendments—Exceptions—Flavoring Extracts.**

Our statute, C. S., ch. 66, dealing with the subject of prohibition, provides by art. 2, sec. 3373, an amendment theretofore enacted in 1911, that it is unlawful to sell or dispose of intoxicating liquors for gain, "except as hereinafter provided," followed in sec. 3375, with the proviso, excepting flavoring extracts when sold as such": *Held*, by express terms of the statute, the amendment of 1911, placed in art. 2 of C. S., ch. 66, "flavoring extracts when sold as such" were excluded from the operation of the general law; and any other interpretation would leave the language of the exception altogether without meaning and contravene the manifest purpose of the Legislature.

3. **Same—Defense—Evidence—Burden of Proof.**

Where the State satisfies the jury beyond a reasonable doubt that the defendant has violated C. S., 3369, by selling or offering for sale intoxi-

cating liquors, or those containing alcohol sufficient to make men drunk, the defendant so indicted must be convicted under the provisions of our prohibition law, C. S., ch. 66, unless he has satisfied the jury with his evidence that the liquids he has sold or offered for sale were in fact and truth flavoring extracts and sold or offered for sale as such.

4. **Same—Instructions—Appeal and Error.**

Where the evidence offered by the State is sufficient to convict the defendant under the provisions of C. S., 3369, of selling or offering for sale an intoxicating liquid sufficient to make men drunk, and there is evidence on the defendant's behalf that the liquid was in truth and fact a flavoring extract coming within the exception of C. S., 3373, 3375, and only sold or offered for sale as such, the question of the guilt or innocence of the defendant depends upon the verdict of the jury upon the conflicting evidence, and it is error for the trial judge to direct a verdict of guilty upon the issue, as a matter of law.

5. **Spirituous Liquor—Intoxicating Liquor—Statutes—Unlawful Sales— Flavoring Extracts—Evidence—Permits—Formulas.**

Where there is sufficient evidence on the part of the State to show that the defendant was guilty of offering for sale or selling intoxicating liquor prohibited by C. S., 3369, and also on defendant's behalf that the liquid was a flavoring extract coming within the exception of C. S., 3373, 3375, and only sold or offered for sale as such, it is competent for the defendant to introduce in evidence the permit of the Federal prohibition officer allowing the manufacture of the formula for the extracts the defendant was selling, also the standard as to the use of alcohol in flavoring extracts established by the Agricultural Department, as tending to show his good faith and that the liquid so offered by him was what it purported to be, a flavoring extract, and not sold for a beverage.

6. **Spirituous Liquors— Intoxicating Liquors— Federal Statutes— State Statutes—Conflict of Laws—Courts—Jurisdiction.**

In case of conflict between the Volstead Act, valid under the Eighteenth Amendment to the Constitution of the United States, and a State statute on the subject of prohibition, the Federal statute controls; but where the Federal law goes further than the State statute, and makes indictable an offense not embraced within the provisions of the latter, or where the State statute excepts such act from its general provisions, so that it is not indictable thereunder, the State court has no jurisdiction of the offense, and a conviction may only be had under an indictment in the United States court.

7. **Same—Police Powers.**

Our State police regulations, affirmative in terms, must be established by the State Legislature and not otherwise.

8. **Spirituous Liquors— Intoxicating Liquors— Federal Statutes— State Statutes.**

The Volstead Act, sec. 4, recognizes and provides for the lawful sale of flavoring extracts, when they are unfit for use as a beverage or for intoxicating beverage purposes, and is not in conflict with C. S., 3373, 3375, when such extracts are unfit for drinking purposes.

**9. Spirituous Liquors—Intoxicating Liquors—Statutes—Exceptions—"Imitation Extracts"—Evidence.**

Where an agent is indicted for violating our State prohibition law, C. S., 3369, and there is evidence tending to show that though he had sold flavoring extracts containing 40 per cent alcohol, they came within the exception of C. S., 3373, 3375, the mere fact that the bottles containing it are labeled "imitation extracts" does not preclude him from establishing his innocence by showing that the word "imitation" had reference alone to the flavor they were endeavoring and intending to produce.

ALLEN, J., concurring; CLARK, C. J., dissenting.

APPEAL by defendant from *Ray, J.,* at the January Term, 1921, of RICHMOND.

The indictment was for "soliciting orders or proposing to take orders, or proposals for the sale of certain spirituous and intoxicating liquors or bitters, or other concoctions containing alcohol." C. S., 3369.

There was evidence on the part of the State tending to show that some time prior to the bill of indictment, defendant, as salesman for Garrett & Company of New York, was offering for sale in and around Hamlet, N. C., certain mixtures or concoctions claimed to be flavoring extracts or essences in bottles of different sizes, from one-third of a pint to a pint, labeled "Garrett & Company, imitation extract, vanilla, grape, banana," etc., twenty-one varieties in all, and that these liquids contained 40 to 45 per cent alcohol, and had in many instances been known to make persons drunk who used them.

Defendant, admitting that the mixture offered by him for sale contained 40 per cent alcohol, or near that, and was about as strong as the average whiskey, offered evidence tending to show that they were in fact and truth flavoring extracts, and were offered by him with the view and purpose of being used and sold as such in the retail trade. That the term on the label, "imitation," did not mean that the article he was proposing to sell was not in fact flavoring extract, but that it was so marked for the purpose of indicating the particular flavor the mixture contained; that is, a flavor imitating brandy peaches, etc. Defendant also offered to show by the chemist having charge of its manufacture that the mixtures offered by him were made after a formula for flavoring extracts submitted to and approved by the Federal Prohibition Commissioner having charge of such matters in North Carolina, and under a permit allowing Garrett & Company to use alcohol in the manufacture of flavoring extracts and that the extracts were made in exact accord with the specifications in said permit, and also in accord with the standard for flavoring extracts established and approved by the United States Department of Agriculture, except that Garrett's extracts lack 10 per cent of containing as much alcohol as the amount adopted for that stand-

ard, which evidence, on objection, was excluded by the court and defendant excepted. Defendant's evidence further tended to show that the extracts so manufactured by Garrett & Company and concerning which defendant was indicted were not made for beverage purposes and not fitted for same. That owing to the amount of flavoring essence, the best that could be procured and 150 per cent strong, they had a tendency to nauseate, and could no more be drunk as a beverage than shellac or shoe polish. And that they were made and offered for sale in good faith as being what they proposed to be, "flavoring extracts," and were so offered only for that purpose. It was further proved for defendant that at least 40 per cent alcohol was necessary to the proper making of these flavoring extracts, according to established formulas or any recognized method of manufacture. The entire statement of the expert witness, Dr. B. H. Smith, on the subject being as follows: "15 per cent or 16 per cent will preserve any vegetable product, but it is necessary to use more to get them into solution. Our vanilla extract that is in evidence, that cannot be made properly and preserved with less than 40 per cent. It might be with 2 or 3 per cent less, but approximately 40 per cent, because it is necessary to hold the vanilla in solution—to go to make up the flavor it requires that per cent to hold them in solution."

At the close of the testimony the court, in effect, charged the jury that if the evidence was believed, and the jury found the facts to be as testified to by the witnesses, they should convict the defendant.

Verdict, guilty. Defendant excepted and appealed, assigning for error:

1. The refusal of his Honor to receive the testimony as to the permit and formula of the United States Prohibition Commissioner, and the standard for flavoring extracts adopted by the United States Department of Agriculture.

2. The charge of his Honor that if the testimony was believed there should be a conviction in any aspect of the evidence.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*Travis & Travis and Gibbons & LeGrand for defendant.*

HOKE, J., after stating the case: The Legislature, at the special session of 1908, passed the general prohibition law against the manufacture and sale of intoxicating liquors, ratified by the voters of the State by a pronounced majority the following May, the principal features of which as pertinent to this inquiry now appear in chapter 66, Consolidated Statutes, designated as article 1. In section 3367 of said article the manufacture and sale of any spirituous, vinous, fermented,

or malt liquors is prohibited, except wines, cider, etc., as therein specified. Section 3368, article 1, defines intoxicating liquors as follows: "All liquors or mixtures thereof by whatever name called that will produce intoxication within the meaning of this article, provided that certain specified medical preparations shall not be held or construed to be or come within the meaning of the definition." Section 3369, in transactions coming under the provisions of the article, makes the place of delivery the place of sale, and section 3370 makes it unlawful for any person, for himself or as agent or traveling salesman of any person, firm, or corporation, to solicit orders or proposals of purchase of intoxicating liquors by the jug, bottle, or otherwise, in this State. There being numerous prosecutions under this statute debated on the issue as to whether a given article was intoxicating, the General Assembly in 1911 enacted a further statute, the principal parts of which appear in chapter 66, Consolidated Statutes, as article 2, and in section 3373 of this article it is made unlawful for any person, firm, or corporation to sell or dispose of for gain, "near-beer, beerine, or other spirituous, vinous, or malt liquors, or mixtures of any kind, and under whatsoever named called, that shall contain alcohol, cocaine, morphine, or other opium derivative except as hereinafter provided."

In a subsequent section under this article, 3375, it is provided that the same shall not extend to or include a long list of specified exceptions such as wines, ciders, etc., various medicinal preparations, and including "the sale of flavoring extracts or essences when sold as such." These two articles being parts of the same statute, and dealing with the same subject, are to be considered and interpreted as a whole and in such case it is the accepted principle of statutory construction that every part of the law shall be given effect if this can be done by any fair and reasonable intendment, and it is further and fully established that where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded. *S. v. Earnhardt,* 170 N. C., 725-727; *Abernethy v. Comrs.,* 169 N. C., 631; *Fortune v. Comrs.,* 140 N. C., 322; *Keith v. Lockhart,* 171 N. C., 451; Black on Interpretation of Laws (2 ed.), pp. 23-66.

While the exception withdrawing "flavoring extracts when sold as such" is in terms excepted from article 2 of the chapter, it having been proved, and without contradiction, that these preparations cannot be properly made without at least 40 per cent alcohol, and so recognized as intoxicating, a quantity making the mixture "about as strong as the average whiskey," in the language of the witness, it is clear that in excepting these extracts from article 2, it was necessarily the evident

intent and purpose of the Legislature to withdraw them from the effect of the prohibition law when they were in fact "what they professed to be and were sold as such." It would not be readily supposed that the Legislature intended to withdraw these preparations of recognized value entirely from domestic use, and when they have expressly excepted flavoring extract from the effect and operation of a law forbidding the sale of "any spirituous liquors, or mixtures of any kind, by whatsoever name known, containing alcohol," it would render this entire exception meaningless, and make the statute a delusion and a snare to entrap the honest dealer, if one acting in good faith under this exception could be indicted, convicted, and imprisoned under the provisions of article 1 of the same chapter. And this position and rule of interpretation, fortified and upheld by a uniform current of decisions here and in other jurisdictions, is not affected because of the suggestion, valid or invalid, and however vehemently urged, that it may afford a means of evading the prohibition law. Such considerations are for the Legislature, whose province it is to enact statutes and to alter and amend them so as to make their purpose more effective. It is ours to construe the laws and not to make them.

This, in our opinion, being the correct construction of the statute, when the State has offered evidence sufficient to satisfy the jury beyond a reasonable doubt that defendant is selling, or offering for sale, a liquor or mixture thereof, containing 40 or 45 per cent alcohol, or which is making men drunk, the defendant should be convicted unless he satisfies the jury, not beyond a reasonable doubt, but satisfies them that what he sells, or is offering for sale, comes within the exception claimed by him, and it must be an extract approved by valid official sanction or recognized as such by the general trade. The burden is on him to so prove to the jury that the article he sells is in fact and in truth what it professed to be, a flavoring extract, and that he is offering it to be used or sold as such for flavoring purposes and not as a beverage. *S. v. Connor,* 142 N. C., 700; *S. v. Goulden,* 134 N. C., 743. And there being testimony, admitted on the part of defendant, tending to show that these preparations were flavoring extracts offered for sale as such in good faith, there was error in holding that on the entire evidence, if believed, and as a conclusion of law, defendant should be convicted, for on such testimony the issue should have been submitted to the jury under the principles as stated. In our opinion there was error, also, in excluding the formula offered, and the permit and approval of the prohibition commissioner thereon, and that the extracts were manufactured in accord with the formula, and likewise as to the standard for vanilla and other extracts, established by the Department of Agriculture. As to the permit, it has been held by our highest Court that the Eighteenth Amend-

ment to the United States Constitution, and the valid provisions of the Volstead Act in furtherance of the same, are, in case of conflict, the controlling law on this subject. Both the one and the other, however, inhibit the manufacture, sale, and transportation of intoxicating liquors only for beverage purposes, and while no State can enact any statute or enforce any regulation in contravention of the declared purpose, there is nothing in either to inhibit a state from passing more stringent regulations in reference to the manufacture and sale of intoxicating liquors, and this permit, therefore, issued by the Federal prohibition officer, is not conclusive or necessarily a protection, S. v. Fore, 180 N. C., 744; Rhode Island v. Palmer, 253 U. S., 350, but both of these items of evidence are competent as tending to show good faith on the part of the defendant, and that these preparations are in fact what they profess to be, flavoring extracts.

It is urged in support of his Honor's ruling, as we understand the position, that the exception relied upon by defendant is now invalid because in conflict with the Eighteenth Amendment and the Federal statute passed in enforcement of the same, the Volstead Act. As heretofore stated, under Rhode Island v. Palmer, supra, and other like decisions, any and all state legislation, in contravention of the Eighteenth Amendment and the valid provisions of the Volstead Act, passed to enforce same are abrogated, and for conduct in violation of the criminal provisions of the Volstead Act, a defendant can be indicted and convicted in the Federal courts notwithstanding that the provisions of the State law would not inculpate. But there is no part of the Volstead Act that provides for or permits an indictment in the State court, and we are well assured that though an exception may be in violation of the Federal law on the subject, a defendant may not be indicted and convicted in the State court for violation of a State statute which contains an exception exculpating him until our own Legislature has acted in the matter and passed a statute that condemns him. Our State police regulations must be established by our own Legislature. We have so held at the present term in S. v. Helms, ante, 566.

As a matter of fact, however, there is no necessary conflict between the State and Federal law on the subject, and as presented in the record. The Volstead Act recognizes and provides for the sale of flavoring extracts, enacting in section 4, among other things, that the law shall not apply to flavoring extracts and syrups that are unfit for use as a beverage or for intoxicating beverage purposes, the same in effect and on the evidence as our own exception, "flavoring extracts or essences when sold as such," the testimony on the part of defendant showing that the extracts sold or offered for sale in this instance, when properly made, were "about as fit for drinking purposes as shellac or shoe polish." And

in any event our statute, more stringent in this respect than the Volstead Act, contains an absolute prohibition of sale of extracts for beverage purposes having in them any alcohol whatever.

It is further urged for the State, and we understand it was on this that his Honor based his ruling, that defendant failed to bring his case under the exception, as claimed, for that the labels show it was only imitation extracts, but we have already referred to the evidence offered by defendant on this point that these words on the label did not at all mean that the articles offered were imitation extracts but they only had reference to the flavor they had endeavored and were intending to produce.

Having given this case most careful consideration, and reached the conclusion that it has not been tried in accordance with the law as it prevails in this jurisdiction, we must direct that there be a new trial of the issue, undisturbed by the dire and distressful calamities predicted as the result of such a course.

More important, even, than the prohibition law is the constitutional principle which guarantees to every citizen charged with crime an impartial and lawful trial by a jury of his peers.

*Venire de novo.*

ALLEN, J., concurring: I concur fully in the calm judicial opinion of *Associate Justice Hoke,* which is confined to a consideration of the legal questions raised by the appeal, without reference to newspaper reports and other extraneous matters, which can only excite the passions and confuse the judgment, but since these have been introduced into the discussion it is possibly well to restate the exact question we have to decide.

The defendant is indicted under C. S., 3370, of the prohibition law for "soliciting orders for intoxicating liquors," and his defense is that he was offering for sale flavoring extracts or essences, section 3375, of the same prohibition law providing that the prohibition against sale, manufacture, etc., of intoxicating liquors shall not be construed to forbid "the sale of flavoring extracts or essences when sold as such."

In the brief filed by the State and signed by the Attorney-General and Assistant Attorney-General, after quoting the two sections, 3370 and 3375, it is said, "the terms of the statute permits the sale of these extracts when sold as such."

This being true, the defendant cannot be convicted under our State law if he was selling extracts or essences as such, and not for beverage purposes.

The defendant testified: "I was offering these extracts for flavoring purposes."

He also offered evidence, which was excluded by the court, that the extracts were prepared in accordance with a formula approved by the National Formulary, except that they contained 10 per cent less of alcohol than was permitted by the National Government; also, that this formula was submitted to the National Prohibition Commissioner of New York, and that he issued permits for the manufacture and sale of the extracts.

There was also evidence that the extracts could not be used for beverage purposes, and were "as undrinkable as shellac or shoe polish."

The judge in the court below not only excluded the evidence referred to, but charged the jury that if they believed the evidence of the State to find the defendant guilty, and this Court is of opinion, and so decides, that the defendant was entitled to the benefit of the evidence excluded, and that the whole case ought to have been submitted to the jury upon the question as to whether the extracts were offered for sale as flavoring extracts or for beverage purposes.

The witness Braswell, it is true, stated that a man was arrested because he was drunk from drinking extracts, but he added to his statement, "No; that was not any that Mr. Barksdale sold."

The whole of the answer of Dr. Smith to the question asked him by the court was as follows: "Yes; 15 per cent or 16 per cent will preserve any vegetable product, but it is necessary to use more to get them into solution. Our vanilla extract that is in evidence here, that cannot be made properly and preserved with less than 40 per cent. It might be with 2 or 2½ per cent less, but approximately 40 per cent. We put 40 per cent because it is necessary to hold the vanilla in solution—to go to make up the flavor it requires that per cent to hold them in solution."

If the State law as it stands is defective and imperfect, it is for the Legislature to correct it. We have no such power.

CLARK, C. J., dissenting: The defendant was indicted and convicted for "soliciting orders for intoxicating liquors contrary to section 3370, Consolidated Statutes." The following is the evidence:

J. S. Braswell, chief of police at Hamlet, testified that the defendant, representing Garrett & Company, was in Hamlet soliciting sales for his goods. That he found the defendant at Terry's Grocery Store, a retail grocery, with these samples (pointing to them), and asked him if he was not Garrett's man. The defendant said he was. He then told the defendant that he was violating the prohibition law, and he would have to take him to his office. The witness said, "We discussed the sale of this stuff right freely, and the amount of alcohol it contained, and the defendant told me that this peach and banana extract contained about 40 per cent alcohol; that he delivered it to the merchants in pint pack-

ages. I said it would be a good drink and would make a man drunk. He said that was the merchant's lookout, and he had nothing to do with that. I tested it, poured some of the contents of the "peach extract" on the paper, struck a match to it, and it caught fire and burned up. This other stuff, "Virginia Dare extract," contains 40 per cent alcohol. It has a very delicious smell; they drink it freely. Yes; I have seen some drunk on that. They had some of these bottles along and were drunk and in jail on it, and paid fines for drinking it. It is intoxicating. This other bottle is a sample of Garrett's imitation grape extract, labeled "Garrett & Company, imitation grape extract, alcohol, 40 per cent"; this bottle is "Garrett's imitation of apricot brandy"; this is "Garrett's imitation of rum extract"; .that other is "Garrett & Company's imitation of apple extract." This is "peach extract." That tastes good—is a right good drink. That next is "Garrett's imitation of banana extract." I have seen them drunk on this "Virginia Dare vanilla." "The last man that was drunk on it was a barber at Hamlet." The State introduced the bottles of extracts testified to above.

The chief of police then went on to say, "The defendant said he was there for the purpose of taking orders and selling it. He had orders for these extracts for sale at other places, but this (Terry's) was the only place I saw him. He showed me his order book; it was full. I was about to take his order book from him, but he said he had been taking orders, and I let him take it back. Yes; he was offering these as flavoring extracts. As I stated, he and Mr. Terry were discussing it. Mr. Terry said they were discussing whether it was legal or not for him to sell that stuff. When I stated that I had seen some one drunk off that vanilla extract, that was before I saw Mr. Barksdale. When that man was arrested and told me he was drunk on it, I went to the merchant that sold it and told him not to sell any more."

The defendant testified that, "This was not my first visit in Hamlet. On this occasion I was trying to sell my extracts. I went to four or five stores and every store I went in they told me (answer objected to). I did not make any sales. I was offering these extracts for flavoring purposes. I had my samples full—from three of a pint on up to a pint. . . . Yes; I was soliciting his order."

Dr. B. H. Smith, witness for the defendant, testified that he lives in Brooklyn, N. Y., and is in the employ of Garrett & Company. He further testified that he had been with Garrett & Company about two years. "They have on hand in Brooklyn some wine—a large quantity, comparatively speaking. The company does extract the alcohol from this wine, but I do not have charge of that." In corroboration of this, it was published in New York papers 29 March, 1921, and broadcast over the country by the Associated Press, that the Garrett Company had

STATE *v.* BARKSDALE.

a quarter of a million dollars worth of liquor seized in Brooklyn on 28 March by the Government authorities. The witness further stated, pointing to a bottle, "That is a half pint. I do not know whether a man would have to drink all that to get drunk. Whiskey is 45 per cent alcohol. *This is about as strong as the average whiskey.* I do not know that a man could drink half of that bottle and be drunk. I am not an expert on that proposition." He further said, speaking of Garrett & Company, "We use the alcohol that has been taken from the wine. As to the brandy, it is an imitation extract of brandy. ' . . . Garrett & Company sent me down here to testify from Brooklyn. We are doing business in every State in the Union. . . . We do not want to be cut off from our sales down here. We would *go to considerable expense to keep it running.* Yes; Garrett & Company are *deeply interested in the outcome of this case for the effect on their business* in this county, at any rate. I had no instructions to do everything in the world to have this man acquitted. I had no instructions of any sort. Mr. Travis wired me to come down and bring the permit. He is attorney for the company. I did not confer with the manager. Mr. Garrett is head of the business. I did not confer with him. Mr. Travis had conferred with him a week or 10 days ago, and he understood what I was coming for." Dr. Smith further testified, in answer to a question by the court, "Can extracts be preserved with less than 40 per cent alcohol?" replied, "Yes; 15 per cent or 16 per cent will preserve any vegetable product."

There was other evidence, but this is the substance of the testimony directly affecting the matter before the court.

The court charged the jury: "The defendant is indicted for soliciting orders for intoxicating liquors. He has pleaded not guilty, and the law raises a presumption of innocence in his favor, which presumption continues throughout the trial until you convict him, if you do convict him. The burden of proof is upon the State, in order to convict him, to prove every essential ingredient, under the law, beyond a reasonable doubt. The law would be doing a vain thing to have the presumption of innocence in favor of the defendant and then to cast the burden of proof upon him to prove his innocence. The burden of proof required of the State is: 'Beyond a reasonable doubt'; that is, a doubt harder to define than the words imply. It means to fully satisfy you beyond a moral certainty as to the truth of the evidence you have heard introduced here before you. The court charges you that the only thing you have to consider in this case is the truth of the State's evidence, and by reason of the defendant's plea he denies the truth of the State's evidence, and says by his plea, which the law authorizes him to make, that all the State has offered is not true. So, gentlemen, if you have no reasonable doubt as to the truth of the State's evidence offered in this case, and have no

doubt, that is, no reasonable doubt, as to the truth of what the witnesses have sworn to for the State, and you believe their testimony beyond a reasonable doubt, then the court directs you to return a verdict of guilty. In addition to what the court has already charged you, it will add that if you believe all the testimony for the State, as it has instructed you, and including that of the defendant, that you will return a verdict of guilty." The jury found the defendant guilty.

The statute under which the defendant was indicted, Laws 1908, ch. 118, sec. 1, now C. S., 3370, reads as follows: *"Unlawful to solicit orders for liquor.* It is unlawful for any person, for himself or as agent or traveling salesman, for any person, firm, or corporation, to solicit orders or proposals of purchase of intoxicating liquors by the jug or bottle or otherwise in the State of North Carolina"; and Laws 1908, ch. 71, sec. 2, now C. S., 3368, defines intoxicating liquors as follows: "All liquors, or mixtures thereof by whatever name called, that will produce intoxication shall be construed and held to be intoxicating liquors within the meaning of *this* article." *"This* article" is article 1. There is a proviso thereto which excepts only medicinal preparations manufactured according to prescribed formula. The defendant admitted that he solicited orders for his preparations, and that they might produce intoxication. The chief of police testified that he "had seen men drunk on this preparation," and Dr. Smith, witness for the defendant, testified that "whiskey is about 45 per cent alcohol. *This is about as strong as the average whiskey,"* and added that he did not know personally that a man could drink half of that half-pint bottle and be drunk. He further testified that the alcohol in these preparations had been taken from wine.

The charge of the judge to the jurors that "If they believed the evidence, beyond a reasonable doubt, the defendant was guilty," was correct under the statute, C. S., 3368, which provides that "liquor which will intoxicate is intoxicating liquor." Besides, this is a self-evident fact. The jury could not possibly have returned any other verdict, and the judge could not have charged correctly in any other way than he did. The only suggestion to the contrary is that in another article (2) of that chapter, in regard to "the sale of near-beer and other specified drinks," sec. 3375 provides: *"This* article (2) shall not be construed to forbid" the sale of certain articles named, principally medicinal, or "the sale of flavoring extracts or essences when sold *as such,"* the sale of medical preparations, etc., and it is contended by the defendant that the words "as such" in article 2, to which alone this section, 3375, refers, shall be transported into section 3868, which applied to all the sections in article 1, and therefore the sale of flavoring extracts, it is argued, is valid notwithstanding they will make men drunk and contain admittedly 40 per cent alcohol, which every man knows will intoxicate.

An English statesman once declared in Parliament that he could "drive a coach and six through any act of Parliament," but if the words *"as such"* have such a powerful effect that they authorize the sale of any liquor that will intoxicate notwithstanding the provisions in the act of 1908, which was ratified by the people of this State on a referendum, this will vitiate the Eighteenth Amendment, which was put into the United States Constitution by the authority of the 105 millions of people of the whole Union, and the Volstead Act, enacted in pursuance thereof. It is not a mere "coach and six," but T. N. T., or that more powerful preparation recently invented, for it has blown up and destroyed absolutely the practical enforcement of the prohibition of liquor by the State Government, and has destroyed the Eighteenth Amendment so far as this State is concerned. It has left not a fragment behind.

It is not reasonable to suppose that the Legislature intended to give such a tremendous import to the words "as such," especially as it limited its meaning to article 2, and it does not apply at all to article 1, under which the defendant was indicted. Why not follow the limitation imposed by the Legislature?

But if the Legislature did pass C. S., 3375, knowingly with intent thereby to destroy efficient prohibition legislation in the State, then the words "as such" have since been stricken out of the statute by the Eighteenth Amendment, as to which the U. S. Supreme Court held, *Rhode Island v. Palmer,* 253 U. S., 386, that it *strikes down* any and every provision in a state constitution or statute which authorizes, or sanctions, what the Eighteenth Amendment forbids, saying: "It is operative throughout the territorial limits of the United States, binds all legislative bodies, courts, public officials, and individuals within those limits and of its own force invalidates every legislative act—whether by Congress, by state legislatures, or by territorial assemblies," and even if the words "as such" had been intended to repeal the provisions of the act of 1908 which made all liquor that would intoxicate, intoxicating liquor, which any one was indictable for offering to sell, then the Eighteenth Amendment has now stricken "as such" out of the statute.

As to the Nineteenth Amendment, we know that of its own force and vigor it struck out of every state constitution the word "male," and that women are entitled to vote and hold office in North Carolina notwithstanding the word "male" has not been taken out of our Constitution by any act of its people.

The usual method of selling flavoring extracts is in very small bottles, 1 ounce or 2 ounces, and it is bought by the ladies of the household. The testimony here is that this article carrying 40 per cent alcohol, and, in the language of the defendant's witness, *"as strong as the average whiskey,"* was sold in pint bottles and even in quarts and gallon con-

tainers, and in the nature of things it was not sold "as such," even if those words had any effect. The defendant's witness, Dr. Smith, could not say that a half-pint bottle of this so-called extract did not intoxicate.

If, however, the words "as such" have authorized the sale of "grape extract," "apricot brandy," "rum extract," Virginia Dare vanilla extract," containing 40 per cent alcohol, and their "apple extract" and the like, then every saloon keeper may well resurrect himself and his place of business. All that is necessary to be done is to stretch a banner across the front of his resurrected saloon and advertise, "Brandy and other extracts, all carrying 40 per cent alcohol or more, called flavoring extracts," and add that the sale is guaranteed from interference by the words "as such," and sell in pint bottles or any other quantity, as desired. As this 40 per cent alcoholic mixture makes men drunk in Hamlet, it will surely do so in Raleigh, and men will be found lying drunk about the streets of Raleigh as they were in Hamlet, and the same results will happen throughout the State.

It will be useless for the courts to try men for violation of the law in selling whiskey which may be 45 per cent alcohol or less when without risk they can buy it as "flavoring extracts" if sold as such, containing 40 per cent, or why not 50 per cent, and be immune.

It will no longer be necessary for the bootlegger to take his customer up a dark alley or make his sale in the back room of some brothel or other place of evil repute when he can boldly reopen his saloon on Fayetteville street in Raleigh, or on the main street of any city in the State, and sell brandies and other decoctions all carrying 40 per cent alcohol, and be protected from liability by selling them as "flavoring extracts."

Dr. Smith, witness for the defendant, testified that he was in the employ of Garrett & Company, and that they had a large quantity of wines on hand from which they derived the alcohol of which he put 40 per cent into these extracts. It was useless for them to allow the seizure of their quarter million dollars of their wines by the Government when they could have been shipped off to North Carolina and sold at will by their traveling agents, as in this case, by virtue of these magical words "as such" in a legislative statute.

Recently three outlaws, carrying a truck load of intoxicating liquors, shot down in the streets of Greensboro, McCuiston, one of the best policemen of that city, leaving his wife and several children to mourn his loss. That act was entirely useless even for the purposes of the outlaws, since all they had to do was to bring over the truck from Danville loaded down with "brandy extract," "apricot brandy," and other brands carrying 40 per cent alcohol, "equal," in the language of the defendant's witness, "*to the average whiskey* in strength," and place a placard on the truck

that they were protected because they were selling flavoring extracts "as such," for neither McCuiston nor any other policeman would have dared interfere if this was lawful.

This is not the question whether the defendant was selling his 40 per cent alcohol in good faith as a flavoring extract. No doubt it was an efficient flavoring extract, and the defendant did not deny that it would make a man drunk, but said that was "a matter for the merchant to whom he sold it." It is not a question of the good faith of the defendant, but whether he was violating that law which the people of this Union and of this State have found necessary to enact for the protection of the public. Our prohibition statute, which was ratified by the people at the ballot box on a referendum, and which is therefore in effect of the dignity of a constitutional amendment, provides: "All liquors or mixtures thereof *by whatever name called* that will produce intoxication shall be construed and held to be intoxicating liquors within the *meaning of this article.*" That is now C. S., 3368; and 3370, in *the same article,* provides that it is unlawful for the defendant or any one else "to solicit orders or proposals of purchase of intoxicating liquors by the jug or bottle or otherwise within the State of North Carolina." The defendant, by his own admission and by the testimony of his witness, Dr. Smith, has proven that he did this very thing. It is not a question of his good faith in believing that he was selling a good flavoring extract. But it was also intoxicating liquor upon his own evidence, and he was violating the laws of this State and of the United States.

The basis of government in every free country is the popular will, formulated into constitutions and statutes, and the welfare of the people depends upon the orderly, faithful execution of those laws unless repealed by the same power that created them.

So clear and overwhelming is the public opinion as to the corruption, the poverty, the crime, and other evils produced by the use of intoxicating liquor that in spite of the enormous power and resistance of the aggregated wealth invested in great breweries and distilleries of all kinds, and the incalculable profits of the innumerable saloons engaged in the retail business, an amendment to the United States Constitution was passed by two-thirds of both Houses of Congress and ratified by 45 state legislatures out of the 48, and this is now the supreme law of the land, which forbids the manufacture, sale, and transportation of intoxicating liquors, and of all traffic therein. This had been previously enacted in this State in 1908, and was ratified by the people by over 40,000 majority. In spite of the overwhelming necessity which in the opinion of the public required this prohibition, the counsel for the defendant contends that the words "as such" inserted in another section, in another chapter, whose application is restricted by its terms to *that* chapter,

permits him to sell a mixture, by 21 different names, which the defendant's witness, Dr. Smith, testified "is as strong as the average whiskey," simply by selling it, not as whiskey—openly and frankly—but by calling it "flavoring extracts."

Upon the testimony of the defendant's witnesses alone, if believed, he was guilty, and the charge of Judge Ray was correct. The real trouble which in the language of the defendant's witness made "Garrett & Company *deeply interested* in the outcome of this case for the effect on their business," is that the judge put their man on the roads instead of imposing a fine which this millionaire corporation would have promptly paid.

It is well known that for years firms and corporations outside the State have shipped into this State, and through their agents have sold large quantities of intoxicating liquor in violation of law and as long as the courts imposed only fines, usually small ones, the custom has been for these outside violators of the liquor law to pay the fees of counsel, and pay all fines and cost laid upon their agents, which aggregate very much less than the license fees would have come to under the former · system of open saloons. It is not suggested that Garrett & Company have done this, though they are defending this case.

The German Ambassador at Buenos Aires recommended his government to sink neutral ships, *spurlos versenkt,* that is, "leaving no trace," and as long as that could be done with impunity, the German undersea boats followed this advice, but when the Allies invented the "depth · bomb" and U. S. put in the North Sea barrage and began to destroy these outlaws of the sea so that the sailors therein did not return to Wilhelmshaven or Kiel, the intended crews of other submarines mutinied and the war came to an end. As long as the agents of these outside companies can violate the law and sell their 40 per cent alcohol or other "mixtures, by whatever name called, that will intoxicate," and shall only have to pay occasional fines, this warfare against the will of the people, as expressed in the Eighteenth Amendment and in our own statutes, will go on, but when the courts, as in this case, begin to impose road sentences from which those companies cannot relieve their agents, they will find it difficult to get agents to face sentences which must be paid by the agents in person. Therefore, this strenuous contention has been made by the eminent and able counsel of this great corporation that the words "as such" used in article 2 of chapter 66, and which on the face is restricted to the sections in *that* article, shall apply to all the sections in article 1, and render null the provision therein that "all liquors or mixtures thereof, by whatever name called, that will produce intoxication shall be construed and held to be intoxicating liquors within the meaning of *this* article." C. S., 3368. It is an astounding proposition advanced by the eminent counsel for the defendant that the words "as such" in

STATE *v.* BARKSDALE.

another article have repealed and rendered powerless this provision in this article which is the original act adopted by the referendum to the people in 1908. If so, it has also repealed the Eighteenth Amendment to the United States Constitution, and so far as that amendment is concerned, North Carolina will have practically seceded from the Union.

Liquor-selling companies will continue to pay cheerfully the fines and costs imposed upon their agents in the few cases in which they happen to be convicted, and thus "keep their business going," but the example of this practical judge from the mountains in sentencing this agent to work out 6 months of a road sentence will embarrass them, hence this strenuous defense. The imposition of a few fines upon their "agents," and the sentencing to the roads of a few "poor whites and niggers," will not concern these nonresident establishments, but when road sentences are put upon pleasant-faced, nicely-dressed agents of nonresident corporations who are making vast sums by violation of both State and Federal laws in selling alcoholic mixtures it will cut down the profits of their business.

The plain, common-sense meaning of the statutes, construed together, is that flavoring extracts can be sold when *bona fide* they are such, *provided,* that "such mixture, by whatever named called," will not intoxicate. This construction repeals neither section, and is consonant to the settled rules of construction of statutes. The defendant and his witness admitted this mixture had 40 per cent alcohol, and did not deny that it would intoxicate. The chief of police testified, and he is not contradicted, that men did get drunk on the defendant's "vanilla extract," and were put in jail. That is the whole case. Why should Congress or the courts worry about 2.75 per cent beer if it is lawful to sell 40 per cent extracts?

The act of 1908 (ratified on a *referendum*) forbade making, selling, etc., intoxicating liquor, and provided, "any mixture, by whatever name called, that will intoxicate is intoxicating liquor within the meaning of *this* act."

The act of 1911 in regard to "near beer," enacted to further restrict and not to enlarge such traffic, provided, that *that* act "shall not forbid the sale of flavoring extracts, sold as such."

If the *major* purpose of this prohibition legislation is to permit the sale of flavoring extracts, then the two provisions, read together, mean, "the sale of intoxicating liquor is illegal, but this shall not forbid the sale of flavoring extracts though they will intoxicate."

If the major purpose of the Eighteenth Amendment and of Federal and State legislation is to prohibit the sale of intoxicating liquor, then the meaning is that flavoring extracts may be sold, as such, *provided* they do not intoxicate."

Which is the chief purpose, and which is subordinate? Upon one or the other of these two standpoints the construction must be made.

Upon the evidence of the defendant's witness, taken alone, and upon the clear, unmistakable language of the statute, the defendant is guilty. The object of the defendant is doubtless to get a new trial, so that before another judge he may beg off with a fine, which his employers will cheerfully pay, for in the language of their own witness and employee, Dr. Smith, "They will go to *considerable expense* to keep the business going." Of course.

The defendant and his witness testified that he was offering 21 different mixtures "as flavoring extracts," bearing 40 per cent alcohol, and different names. If these can be sold, where is the limit? Suppose, in fact, mixtures carrying 50 per cent or 60 per cent alcohol are offered as "flavoring extracts." Dr. Smith said that these extracts were "as strong as the average whiskey." Any other manufacturer can sell flavoring extracts, bearing different names and possibly a higher per cent of alcohol, and *"as such"* shops can spring up all over North Carolina in place of the old "bar rooms," "saloons," and "corner groceries."

The Eighteenth Amendment is a constitutional provision, and if there were any conflict between it and our constitutional provision for trial by jury, the Eighteenth Amendment is of the higher dignity. But there is no conflict between them. The Eighteenth Amendment forbids the manufacture, sale, or transportation of intoxicating liquor. When, therefore, the defendant and his witnesses testified that this mixture was 40 per cent alcohol—and as strong as the average whiskey—and the State's witness testified that it had made several men drunk who were put in jail for it, the judge could do no less than tell the jury if they believed the evidence for the State and the defense to find the defendant guilty. *S. v. Fore (Allen, J.,* for a unanimous Court), 180 N. C., 744; *S. v. Reed, ante,* 508; *S. v. Pearson* (top of page), *ante,* 589.