MAZDA MOTORS OF AMERICA, INC. v. SOUTHWESTERN MOTORS, INC.,
D/B/A MAZDA OF RALEIGH

No. 51

(Filed 4 January 1979)

1. **Contracts § 17.2— automobile dealer franchise agreement—mutual termination agreement—notice and hearing requirements inapplicable**

    The notice and hearing provisions of G.S. 20-305(6) for termination of an automobile dealership franchise agreement apply solely to unilateral franchise terminations by the manufacturer and do not extend to mutual agreements between manufacturer and dealer to terminate a franchise.

2. **Duress § 1— termination of automobile dealership franchise—no economic duress**

    The evidence supported the trial court's finding that an agreement terminating an automobile dealership franchise was not the result of coercion or duress imposed by the automobile manufacturer.

3. **Accounts § 2— account stated**

    For an account stated to arise, it is essential that there be an agreement between parties that an account rendered by one of them to the other is correct.

4. **Accounts § 2— transfer of indebtedness—letter not account stated**

    A letter from plaintiff to defendant automobile dealer stating that parts and tools from another dealership had been placed in defendant's inventory and that the indebtedness for these parts and tools would be transferred to defendant's account was insufficient to establish an account stated where there was no evidence that plaintiff ever submitted to defendant an account reflecting the value of the transferred inventory.

    Justices BRITT and BROCK took no part in the consideration or decision of this case.

ON plaintiff's petition for discretionary review of the decision of the Court of Appeals, 36 N.C. App. 1, 243 S.E. 2d 793 (1978), affirming in part and reversing in part judgment of *Bailey, J.,* entered 24 November 1976 in WAKE Superior Court.

This is an action for breach of contract arising out of a dispute over the termination of an automobile dealership agreement between plaintiff and defendant.

In the fall of 1971 plaintiff's predecessor granted defendant a franchise to open a dealership in Raleigh, North Carolina, for the sale of Mazda automobiles. Defendant began operations as an

authorized Mazda dealer in January 1972. Thereafter, by an instrument dated 1 January 1973, defendant and plaintiff entered into a written agreement entitled "Mazda Direct Dealer Agreement" for the calendar year 1973.

Plaintiff and defendant did not enter into a dealership agreement for 1974; however, defendant continued to operate as a Mazda dealer and bought parts and vehicles from defendant during a portion of that year. Defendant experienced economic problems during 1974. It lost its floor plan financing and its premises were temporarily padlocked by the Internal Revenue Service for nonpayment of taxes. In late May 1974 plaintiff requested defendant to execute a mutual termination agreement, but defendant refused to do so.

Following such refusal, plaintiff, by letter dated 3 June 1974, notified defendant that any and all agreements for the conduct of a Mazda dealership were terminated effective 18 June 1974. A copy of this letter was mailed to the Commissioner of Motor Vehicles on 7 June 1974.

On 21 June 1974 Jack Carlisle, president of defendant, telephoned plaintiff's branch manager and requested that defendant's Mazda dealership be allowed to continue until 31 August 1974. The text of this conversation was written into a letter dated 21 June 1974 from Carlisle to plaintiff's branch manager. Thereafter, on 10 July 1974, the parties entered into a written agreement whereby plaintiff and defendant mutually agreed to terminate the Mazda dealership in Raleigh effective 31 August 1974. Notice of this agreement was sent to the Commissioner of Motor Vehicles on 14 October 1974.

Defendant continued operations after 31 August 1974, refused to terminate the dealership as it had agreed to do, continued to hold itself out as a Mazda dealer, and refused to permit plaintiff to enter the premises to take an inventory of parts. As a result, this action was filed by plaintiff on 21 October 1974, alleging breach of contract.

In its complaint plaintiff sought to permanently enjoin defendant from representing itself as a Mazda dealer and from preventing plaintiff from taking a detailed inventory of parts, accessories, special tools and equipment, and authorized signs.

Plaintiff also sought a temporary restraining order and preliminary injunction to the same effect pending a final determination of the matter. Finally, plaintiff sought leave to amend its complaint to plead damages after completing the inventory.

Plaintiff's motion for a temporary restraining order was granted 21 October 1974 and its motion for preliminary injunctive relief was heard and granted 30 October 1974. By its amended complaint, allowed 15 November 1976, plaintiff alleged specific damages.

Defendant timely filed answer and counterclaim. In its counterclaim defendant sought to recover compensatory and punitive damages for the alleged unlawful termination of its Mazda dealership.

The case came on for trial before Judge Bailey at the 15 November 1976 Civil Session of Wake Superior Court. After considering the evidence of both parties Judge Bailey, sitting as judge and jury, entered final judgment on 24 November 1976. In that judgment he found facts and (1) made permanent the injunctive relief previously granted, (2) determined that plaintiff's and defendant's mutual agreement to terminate defendant's Mazda franchise was in all respects lawful, (3) concluded that G.S. 20-305(6) was inapplicable to the facts in this case, and (4) determined all remaining questions as to the rights of the parties raised by the pleadings. Defendant appealed to the Court of Appeals.

On 18 April 1978 the Court of Appeals held in pertinent part that the franchise agreement between the parties was wrongfully terminated because plaintiff failed to comply with the notice requirements of G.S. 20-305(6) and remanded the case to the trial court. Plaintiff appealed to the Supreme Court on alleged constitutional grounds and petitioned for discretionary review. We allowed the petition and denied a motion to dismiss the appeal.

*Poyner, Geraghty, Hartsfield & Townsend by John J. Geraghty, David W. Long and Cecil W. Harrison, Jr., attorneys for plaintiff appellant.*

*Newsom, Graham, Strayhorn, Hedrick, Murray, Bryson & Kennon by Josiah S. Murray III and Lewis A. Cheek, attorneys for defendant appellee.*

HUSKINS, Justice.

Plaintiff presents two questions which determine this appeal: (1) Does the 10 July 1974 mutual termination agreement between plaintiff and defendant effectively terminate the automobile dealership between the parties? (2) Does defendant owe plaintiff on account the sum of $8,795.09?

Resolution of the first question requires consideration of G.S. 20-305(6) which provides:

"It shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or any representative whatsoever of any of them:

\*     \*     \*     \*

(6) Notwithstanding the terms of any franchise agreement to terminate, cancel, or refuse to renew the franchise of any dealer, without good cause, and unless (i) the dealer and the Commissioner have received written notice of the franchisor's intentions at least 60 days prior to the effective date of such termination, cancellation, or the expiration date of the franchise, setting forth the specific grounds for such action, and (ii) the Commissioner has determined, if requested in writing by the dealer within such 60-day period, and after a hearing on the matter, that there is good cause for the termination, cancellation, or nonrenewal of the franchise, except in the event of fraud, insolvency, closed doors, or failure to function in the ordinary course of business, 15 days' notice shall suffice; provided that in any case where a petition is made to the Commissioner for a determination as to good cause for the termination, cancellation, or nonrenewal of a franchise, the franchise in question shall continue in effect pending the Commissioner's decision . . . ."

Plaintiff contends this statute is not applicable to the voluntary mutual termination agreement under attack by defendant in this case.

Defendant contends the 10 July 1974 mutual termination agreement did not effectively terminate the dealership agreement

between the parties. Defendant relies on G.S. 20-305(6) which, "notwithstanding the terms of any franchise agreement," makes it unlawful for a manufacturer to "terminate, cancel, or refuse to renew the franchise of any dealer without good cause" and without giving sixty days' written notice of intention to terminate. Subsection (6) entitles dealers who have received the statutory termination notice to make a written request within the sixty-day notice period for a hearing before the Commissioner of Motor Vehicles on the question whether there was good cause for the termination. In the event of "fraud, insolvency, closed doors, or failure to function in the ordinary course of business," the notice period is reduced to fifteen days. Defendant argues that the notice and hearing provisions of G.S. 20-305(6) are applicable even when manufacturer and dealer enter into a mutual agreement to terminate the franchise. According to defendant, the mutual termination agreement of 10 July 1974 could not lawfully terminate the earlier franchise agreement between plaintiff and defendant on account of plaintiff's failure to give the required statutory notice of termination to both defendant *and* the Commissioner of Motor Vehicles.

[1] Do the notice and hearing provisions of G.S. 20-305(6) apply to a mutual agreement between dealer and manufacturer to terminate an earlier franchise agreement? In order to answer this question we must interpret the language of G.S. 20-305(6).

The intent of the legislature controls the interpretation of a statute. *In re Banks*, 295 N.C. 236, 244 S.E. 2d 386 (1978); 12 N.C. Index 3d, Statutes, § 5.1. If the language of a statute is free from ambiguity and expresses a single, definite, and sensible meaning, judicial interpretation is unnecessary and the plain meaning of the statute controls. *Food House, Inc. v. Coble, Sec. of Revenue*, 289 N.C. 123, 221 S.E. 2d 297 (1976); *Commissioners v. Henderson*, 163 N.C. 114, 79 S.E. 442 (1913). Conversely, "where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." *State v. Barksdale*, 181 N.C. 621, 107 S.E. 505 (1921). *See also In re Hardy*, 294 N.C. 90, 240 S.E. 2d 367 (1978).

Due consideration of the language of G.S. 20-305(6) leads us to conclude that its provisions are free from ambiguity, apply *solely*

to unilateral franchise terminations by the manufacturer, and do not extend to mutual agreements between manufacturer and dealer to terminate a franchise. The language of G.S. 20-305(6) is expressly couched in terms of the unilateral conduct of the franchisor. The franchisor cannot terminate, cancel, or refuse to renew a franchise unless it has good cause for taking such action and unless it gives written notice to dealer and Commissioner of Motor Vehicles of its "intentions" at least sixty days prior to the date of termination. Moreover, upon being notified of "franchisor's intentions" dealer has the option of requesting a hearing before the Commissioner of Motor Vehicles to determine whether there is good cause for the termination. In effect, the express language of G.S. 20-305(6) imposes substantial curbs on the unilateral actions of a manufacturer with respect to franchise termination. The express language does not cover voluntary mutual termination agreements between manufacturer and dealer.

Such a reading of subsection (6) does not lead to absurd results nor does it contravene the manifest purpose of the statute. Literally read, the language adopted by the General Assembly permits an automobile dealer to voluntarily forego the substantial protection of notice and hearing by signing a mutual termination agreement. Rather than enter into such an agreement, a dealer may require the manufacturer to terminate the franchise in accordance with the provisions of G.S. 20-305(6). Such result does not frustrate the protection afforded a dealer by subsection (6); rather, it represents a legislative determination that a dealer may voluntarily forego the safeguards against franchise termination if in his judgment he deems them unnecessary. It is not for us to question the wisdom of this determination. *Commissioners v. Henderson, supra.* The meaning of the law is plain and we must apply it as written. *In re Poindexter's Estate,* 221 N.C. 246, 20 S.E. 2d 49 (1942). We note parenthetically that a dealer who enters into a mutual termination agreement with a manufacturer still benefits from the protection offered by the common law defense of economic duress and the specific provisions of G.S. 20-305(2) which make it unlawful for a manufacturer to coerce or attempt to coerce a dealer to enter into an agreement with such manufacturer by threatening to cancel any franchise existing between manufacturer and dealer.

Mazda Motors v. Southwestern Motors

In light of the foregoing conclusions, we neither reach nor decide the constitutional question argued in the briefs. *See State v. Blackwell,* 246 N.C. 642, 99 S.E. 2d 867 (1957); *State v. Lueders,* 214 N.C. 558, 200 S.E. 22 (1938).

[2] Defendant next contends that it executed the mutual termination agreement of 10 July 1974 under duress and coercion imposed by plaintiff. Defendant alleged, in pertinent part, that plaintiff refused to resupply it with replacement parts necessary to the operation of its business unless it entered into a mutual termination agreement. The trial court found as a fact that the mutual termination agreement of 10 July 1974 was not the *product* of coercion or duress. Such finding is binding on this Court if supported by competent evidence, even though there be evidence to the contrary. *Cogdill v. Highway Comm.,* 279 N.C. 313, 182 S.E. 2d 373 (1971). There is competent evidence in the record before us to support the trial court's finding of no duress or coercion. The evidence offered by plaintiff includes a letter dated 21 June 1974 from Jack Carlisle, president of defendant, to plaintiff's branch manager in which Mr. Carlisle expresses gratitude to plaintiff for its past cooperation and indicates defendant's willingness to terminate the franchise 31 August 1974. This letter memorialized the contents of a telephone conversation initiated by Mr. Carlisle on 21 June 1974. Also negating duress and coercion is evidence tending to show that defendant was kept supplied with replacement parts during the summer of 1974; that by the summer of 1974 defendant had lost its floor plan financing and had been padlocked for several days by the Internal Revenue Service for nonpayment of taxes. Defendant's objections to the trial court's findings of no coercion or duress in the execution of the 10 July 1974 mutual termination agreement were properly overruled.

[4] Finally, defendant contends the trial court erred in finding that defendant Mazda of Raleigh owed plaintiff on account the sum of $8,795.09. The record contains the following evidence pertinent to this question: Mr. Jack J. Carlisle, president of defendant Mazda of Raleigh, was also a principal in Sentry Mazda, a Mazda dealership in Greensboro, North Carolina. Sentry Mazda was given notice of termination the same day as Mazda of Raleigh. Sentry Mazda was closed in June of 1974 and its parts inventory was transferred to Mazda of Raleigh. Mr. Carlisle testified that "after the termination [plaintiff] had sent us, I

realized that I could not fight [plaintiff] on two fronts. We moved twenty-some hundred dollars worth of parts from Greensboro, closed up, and moved the parts to Raleigh." Thereafter, on 15 August 1974, plaintiff's controller stated the following in a letter directed to Carlisle:

> "This letter is to inform you that because, upon termination of Sentry Mazda, parts and tools were taken to your Mazda of Raleigh dealership and, at least partially, integrated into the Mazda of Raleigh inventory, Mazda Motors of America will transfer the indebtedness for these parts and tools from the account of Sentry Mazda to the account of Mazda of Raleigh.

> Accordingly, we will this month credit the outstanding Sentry parts balance to Sentry's parts account and will debit a like amount to the Mazda of Raleigh account.

> When Mazda of Raleigh terminates at the end of this month, all parts and tools returned will be netted against the Mazda of Raleigh parts account."

Mr. Carlisle received this letter but never responded to it.

Is the above evidence sufficient to establish an account stated between defendant Mazda of Raleigh and plaintiff for $8,795.09, representing the value of parts transferred to defendant from Sentry Mazda? We think not.

[3]  " 'An account stated may be defined, broadly, as an agreement between the parties to an account based upon prior transactions between them, with respect to the correctness of the separate items composing the account, and the balance, if any, in favor of the one or the other. The amount or balance so agreed upon constitutes a new and independent cause of action, superseding and merging the antecedent causes of action represented by the particular constituent items; it is a liquidated debt, as binding as if evidenced by a note, bill or bond.' 1 Am. Jur. 272, Accounts and Accounting, Section 16." *Teer Co. v. Dickerson, Inc.,* 257 N.C. 522, 126 S.E. 2d 500 (1962). Thus, for an account stated to arise it is essential that there be "an agreement between parties that an account rendered by one of them to the other is correct." *Mahaffey v. Sodero,* 38 N.C. App. 349, 247 S.E. 2d 772 (1978). *See also, Little v. Shores,* 220 N.C. 429, 17 S.E. 2d 503 (1941).

[4] Due consideration of the record reveals no competent evidence to support a finding that plaintiff and defendant ever agreed on the balance due as a result of the transfer of parts between Sentry Mazda and defendant. There is sufficient evidence to establish that a transfer of parts did take place and that the parties agreed to reflect this transfer as a credit on the Sentry account and a debit on defendant's account. However, there is no evidence in the record that plaintiff ever submitted to defendant an account reflecting debits attributable to the transfer of parts from Sentry Mazda to defendant. Nor is there any evidence which establishes *the value of the inventory transferred from Sentry Mazda to defendant.* Plaintiff contends that an account it submitted to Sentry Mazda dated 30 June 1975 in the amount of $8,795.09 establishes the value of the transferred inventory. This contention is unsound. The 1975 Sentry account of $8,795.09 is not probative of the value of inventory transferred from Sentry to defendant in June of 1974 since such indebtedness does not necessarily reflect *the inventory on hand* at the time of the transfer. In sum, plaintiff has established its right to debit defendant's account to reflect parts transferred from Sentry Mazda but has failed to establish the amount to be debited.

The judgment of the trial court debiting defendant's account in the amount of $8,795.09 is unsupported by the evidence. Let the case be remanded to the trial court for a determination of the amount of defendant's indebtedness to plaintiff for inventory received by defendant from Sentry Mazda. We note that the calculations contained in the judgment of the trial court are seemingly a few dollars in error, but neither party has objected to the minimal discrepancies in the calculations.

For the reasons stated the decision of the Court of Appeals is reversed with respect to question (1), affirmed with respect to question (2), and the case is remanded for further proceedings consistent with this opinion.

Reversed in part; affirmed in part; and remanded.

Justices BRITT and BROCK did not participate in the consideration or decision of this case. .