IN THE SUPREME COURT OF NORTH CAROLINA

No. 24PA12

FILED 8 NOVEMBER 2013

DEWEY D. MEHAFFEY, Employee

v.

BURGER KING,
        Employer,

LIBERTY MUTUAL INSURANCE COMPANY,
        Carrier


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 718 S.E.2d 720 (2011), affirming in part and reversing in part an opinion and award filed on 18 August 2010 by the North Carolina Industrial Commission. Heard in the Supreme Court on 14 November 2012.

*Sumwalt Law Firm, by Mark T. Sumwalt and Vernon Sumwalt; and Grimes Teich Anderson LLP, by Henry E. Teich, for plaintiff-appellant.*

*Hedrick, Gardner, Kincheloe & Garofalo, L.L.P., by M. Duane Jones and Jeremy T. Canipe, for defendant-appellees.*

HUDSON, Justice.


This case presents the question whether the Medical Fee Schedule promulgated by the North Carolina Industrial Commission (Commission) may bar certain individuals from receiving compensation for attendant care services they provided before obtaining approval for those services from the Commission. We hold that the Commission may not do so since such action would exceed the power granted

to the Commission by the General Assembly. Because the Court of Appeals enforced that provision of the Commission's Medical Fee Schedule, which we conclude was adopted in excess of the Commission's authority, we reverse in part the decision of the Court of Appeals. But because defendants here have challenged the reasonableness of the timing of plaintiff's request for approval of attendant care and the Commission's findings do not address this issue, we remand for the Commission to do so.

On 13 August 2007, plaintiff suffered a compensable injury to his left knee while working as a restaurant manager for defendant Burger King, where he had been employed for approximately eighteen years. As a result of his injury, plaintiff underwent a "left knee arthroscopy with a partial medial meniscectomy" at Transylvania Community Hospital. Plaintiff's condition failed to improve after surgery, and he ultimately developed "reflex sympathetic dystrophy" ("RSD"). Despite undergoing a number of additional procedures, plaintiff continued to suffer pain. Plaintiff eventually was diagnosed with depression related to the injury and resulting RSD, and his psychiatrist concluded that it was unlikely plaintiff's "mood w[ould] much improve until his pain is under better control."

Likely due to pain, plaintiff increasingly attempted to limit his movements following his diagnosis of RSD. By 8 April 2008, plaintiff was using "an assistive device" to move or walk around. On 21 April 2008, John Stringfield, M.D., plaintiff's family physician, prescribed a mobility scooter for plaintiff, and medical records show

that by 20 June 2008, plaintiff was using a walker. On 18 December 2008, plaintiff requested a prescription for a hospital bed from Eugene Mironer, M.D., a pain management specialist with Carolina Center for Advanced Management of Pain, to whom plaintiff had been referred as a result of his diagnosis with RSD. Dr. Mironer's office declined to recommend a hospital bed, instructing plaintiff to see his family physician instead. That same day plaintiff visited his family physician, Dr. Stringfield, who prescribed both a hospital bed and a motorized wheelchair.

Since plaintiff's injury, his wife has assisted him with his daily activities in the home. Until 14 August 2008, plaintiff's wife attended to his needs approximately four hours per day. On 15 August 2008, Mrs. Mehaffey discontinued her outside employment, and since then she has attended to plaintiff's needs approximately sixteen hours per day. In her caregiver role, Mrs. Mehaffey helps "plaintiff out of bed in the morning, gives him a sponge bath, and assists [him] in dressing." She also helps "get [him] onto the scooter and transfers [him] from the scooter to a recliner, where plaintiff sits most of the day." She prepares plaintiff's meals and attends to his bodily needs. At the end of each day, Mrs. Mehaffey helps "plaintiff dress for bed and helps him into bed."

Despite plaintiff's efforts to limit his activity and movement, the medical providers plaintiff saw for pain management indicated that he would derive greater benefit if he attempted to move under his own strength, which would force him to rehabilitate his injury. James North, M.D., the codirector of pain management at

Wake Forest Baptist Hospital and plaintiff's preferred treating physician, "opined that providing plaintiff with a power wheelchair was counterproductive to his recovery" because "people using wheelchairs tend to gain weight and avoid using the extremity that causes their pain, both of which impede[ ] the recovery process." Dr. North reasoned that "the less an injured extremity is used, the worse the condition will become." Likewise, Dr. North concluded "that there was no scientific or medical basis for requiring a hospital bed for patients with RSD." Dr. North's medical opinion was echoed by Dr. Mironer. Nonetheless, plaintiff used these mobility aids and comfort devices, procuring for himself the hospital bed and motorized scooter.

Plaintiff's family physician and other individuals began to recommend that plaintiff receive attendant care services. On 9 March 2009, Judy Clouse, a nurse consultant employed by the Commission, recommended that plaintiff receive eight hours of attendant care daily, Monday through Friday, from a Certified Nursing Assistant. On 5 June 2009, Dr. Stringfield recommended that plaintiff have sixteen hours a day of attendant care services, retroactive to the day plaintiff was diagnosed with RSD, thereby including the almost two years of attendant care plaintiff's wife had already provided. Bruce Holt, a certified life care planner, also opined that plaintiff "needs attendant care for at least 16 hours per day, seven days a week."

In light of these recommendations regarding his needs, plaintiff sought a hearing before the Commission to clarify the extent of medical compensation owed to him. Defendants denied any failure to pay for necessary medical treatment. Relevant

for our purposes, plaintiff and defendants disagree whether plaintiff's wife should be compensated for the attendant care she provided plaintiff before the Commission approved her rendering that service. Defendants contend that the Commission's Medical Fee Schedule prevents such an award of retroactive compensation to Mrs. Mehaffey. Plaintiff, on the other hand, views Mrs. Mehaffey's attendant care services as simply another component of medical compensation within the meaning of N.C.G.S. § 97-2(19) (2007), for which defendants are responsible under N.C.G.S. § 97-25 (2007).

The Commission agreed with plaintiff on this issue, choosing not to follow its own fee schedule, perhaps in recognition that it was not authorized to deny reimbursement for these services. First, in an opinion and award filed on 29 January 2010, a deputy commissioner directed defendants to compensate Mrs. Mehaffey for the "attendant care services rendered to plaintiff at the rate of $12.50 per hour, 16 hours per day and seven days per week, from 15 August 2008, through the present and continuing until further order of the Commission." On appeal the Full Commission affirmed in pertinent part the deputy commissioner's opinion and award, concluding that Mrs. Mehaffey's attendant care services were medical compensation for which defendants were responsible under sections 97-2(19) and 97-25 of our General Statutes. In addition, the Full Commission further compensated Mrs. Mehaffey for the attendant care services previously provided from 15 November 2007 through 14 August 2008, while she was still employed outside the home. For those

attendant care services the Full Commission awarded compensation for four hours daily, seven days a week, also at a rate of $12.50 per hour.

The Court of Appeals, relying on our decision in *Hatchett v. Hitchcock Corp.*, 240 N.C. 591, 83 S.E.2d 539 (1954), reversed the Commission's decision to provide compensation for Mrs. Mehaffey's past attendant care services. *Mehaffey v. Burger King*, ___ N.C. App ___, ___, 718 S.E.2d 720, 723-24 (2011). In *Hatchett* we were presented with a situation in which the Commission had awarded financial compensation to an injured worker's mother under sections 97-25 and 97-26 of our General Statutes for practical nursing services that she provided to her son without prior approval from the Commission. 240 N.C. at 592-93, 83 S.E.2d at 540-41. Ultimately, this Court determined that the Commission's fee schedule, promulgated pursuant to the Commission's rulemaking authority under the Workers' Compensation Act (the Act), prohibited such an award of compensation for practical nursing services unless that conduct had been first approved by the Commission. *Id.* at 593-94, 83 S.E.2d at 541-42. As a result, we reversed the Commission's award.

The Court of Appeals reasoned that the outcome in the present case is controlled by our decision in *Hatchett*. First, that court observed that the claim for payment in this case was brought under sections 97-25 and 97-26 of our General Statutes, the same provisions that were at issue in *Hatchett*. *Mehaffey*, ___ N.C. App. at ___, 718 S.E.2d at 724. Additionally, the Court of Appeals explained that the language of the rule at issue in *Hatchett*, which said, "Fees for practical nursing

service by a member of claimant's family or anyone else will not be honored unless written authority has been obtained in advance," is nearly identical to the language now found in the Commission's Medical Fee Schedule. *Id.* at ___, 718 S.E.2d at 723-24 (citations and quotation marks omitted). As a result, the Court of Appeals concluded that the Commission should have followed the holding of *Hatchett* and thus declined to award compensation for Mrs. Mehaffey's past provision of attendant care services. *Id.* at ___, 718 S.E.2d at 724.

We allowed plaintiff's petition for discretionary review to consider the Court of Appeals' decision regarding the Commission's award of compensation for past attendant care services provided before approval was obtained from the Commission. *Mehaffey v. Burger King*, ___ N.C. ___, 726 S.E.2d 177 (2012). Plaintiff contends that the Court of Appeals erred by following the holding of *Hatchett*. Instead, plaintiff asserts that the Commission does not have statutory authority under section 97-26(a) to prohibit compensation of an immediate family member for the provision of attendant care services unless prior authorization was obtained. Defendants, on the other hand, contend that the Court of Appeals properly followed our decision in *Hatchett*. Moreover, defendants argue that allowing members of an injured employee's immediate family to be compensated for providing attendant care without the Commission's having first approved that service would contravene one of the underlying purposes of the Act, which is to control medical expenses. To resolve this dispute we turn first to the provisions of the Act.

Generally speaking, the Act provides for the compensation of employees who sustain workplace injuries. N.C.G.S. §§ 97-1 to -101.1 (2011). The Act places upon an employer the responsibility to furnish "medical compensation" to an injured employee. *Id.* § 97-25. At the time of plaintiff's injury, the Act defined "medical compensation" as:

> Medical Compensation. – The term "medical compensation" means medical, surgical, hospital, nursing, and rehabilitative services, and medicines, sick travel, and other treatment, including medical and surgical supplies, as may reasonably be required to effect a cure or give relief and for such additional time as, in the judgment of the Commission, will tend to lessen the period of disability; and any original artificial members as may reasonably be necessary at the end of the healing period and the replacement of such artificial members when reasonably necessitated by ordinary use or medical circumstances.

*Id.* § 97-2(19) (2007). The Act's catch-all provision for "other treatment" has been understood to include attendant care services. *See, e.g.*, *Ruiz v. Belk Masonry Co.*, 148 N.C. App. 675, 681, 559 S.E.2d 249, 253-54 (upholding an award of attendant care benefits), *appeal dismissed and disc. rev. denied*, 356 N.C. 166, 568 S.E.2d 610 (2002). Moreover, the parties do not dispute that attendant care services fall under the version of section 97-2(19) in effect when plaintiff was injured and that the current version of that statute expressly includes "attendant care services," N.C.G.S. § 97-2(19) (2011).

The Act is designed also to control medical costs. Indeed, as we said in *Charlotte-Mecklenburg Hospital Authority v. North Carolina Industrial Commission,*

"The General Assembly enacted the Act in 1929 to both provide swift and sure compensation to injured workers without the necessity of protracted litigation, and to insure a limited and determinate liability for employers." 336 N.C. 200, 203, 443 S.E.2d 716, 718-19 (1994) (citation, alteration, and internal quotation marks omitted)), *superseded by statute*, The Workers' Compensation Reform Act of 1994, ch. 679, sec. 2.3, 1993 N.C. Sess. Laws (Reg. Sess. 1994) 394, 398 (amending N.C.G.S. § 97-26(b) effective 1 October 1994). The latter is essentially a trade-off for the former.

In keeping with its desire to control medical costs, in 1994 the legislature directed the Commission to "adopt a schedule of maximum fees for medical compensation," which would enable employers more accurately to predict their potential financial exposure following an employee's injury. The Workers' Compensation Reform Act of 1994, ch. 679, sec. 2.3, 1993 N.C. Sess. Laws (Reg. Sess. 1994) 394, 397 (codified at N.C.G.S. § 97-26(a)). Before that time an employer's pecuniary liability was tethered to the costs that prevailed "in the same community for similar treatment of injured persons of a like standard of living when such treatment is paid for by the injured person." *Id.* Departing from its previous standard, the General Assembly instructed that this new Medical Fee Schedule "shall be adequate to ensure that (i) injured workers are provided the standard of services and care intended by this Chapter, (ii) providers are reimbursed reasonable fees for providing these services, and (iii) medical costs are adequately contained." *Id.* The

adoption of a Medical Fee Schedule aids in fulfilling a purpose of the Act by indicating to employers the amount of their potential financial exposure.

The central issue in the case *sub judice* is whether the Commission exceeded its authority in promulgating a provision of its Medical Fee Schedule to create a prerequisite to reimbursement for certain care. To answer this question, like all similar questions, we must ascertain whether the General Assembly authorized the administrative body—here the Industrial Commission—to undertake the challenged conduct. *E.g.*, *High Rock Lake Partners, LLC v. N.C. DOT*, ___ N.C. ___, ___, 735 S.E.2d 300, 303-04 (2012). Administrative agencies, as creatures of statute, may act only as authorized by the legislature. *In re Broad & Gales Creek Cmty. Ass'n*, 300 N.C. 267, 280, 266 S.E.2d 645, 654-55 (1980) (citations omitted). As an administrative agency, the Commission must act consistently with the intent of the General Assembly. *See, e.g.*, *Gregory v. W.A. Brown & Sons*, 363 N.C. 750, 763-64, 688 S.E.2d 431, 440 (2010). A provision of the Commission's Medical Fee Schedule that is contrary to our General Statutes is, as a result, without effect. *Forrest v. Pitt Cnty. Bd. of Educ.*, 100 N.C. App. 119, 125-28, 394 S.E.2d 659, 662-64 (1990), *aff'd per curiam*, 328 N.C. 327, 401 S.E.2d 366 (1991).

We understand the difficulty in monitoring home health care, especially when furnished by a family member. In an apparent effort to address this issue, the Commission adopted Section 14 of the Medical Fee Schedule, which states in pertinent part:

> Except in unusual cases where the treating physician certifies it is required, fees for practical nursing services by members of the immediate family of the injured will not be approved unless written authority for the rendition of such services for pay is first obtained from the Industrial Commission.

While good policy reasons may exist for the prerequisites created here in the Schedule, this matter is a legislative determination, not one to be made by the Commission without statutory authorization. Neither section 97-26(a) nor any other provision in our General Statutes grants the Commission the power to create such a requirement. *See* N.C.G.S. § 97-26(a). In fact, the legislature explicitly stated that the Commission's Medical Fee Schedule "shall . . . ensure that . . . providers are reimbursed reasonable fees for" their services. *Id.* And as the enabling legislation indicates, the fee schedule is designed to facilitate uniformity and predictability in the medical costs employers are required to pay under the Act. *See* Ch. 679, sec. 2.3, 1993 N.C. Sess. Laws (Reg. Sess. 1994) at 397. Section 97-26(a) of our General Statutes does not give the Commission the authority to mandate that certain attendant care service providers may not be compensated unless they first obtain approval from the Commission before rendering their assistance. N.C.G.S. § 97-26(a). As a result, we are unable to permit Section 14 of the Commission's Medical Fee Schedule to prevent the award of retroactive compensation for the attendant care services Mrs. Mehaffey provided her husband. *See Forrest*, 100 N.C. App. at 125, 394 S.E.2d at 662 (noting that the Commission's Medical Fee Schedule is "superseded by" our General Statutes).

We are mindful that this result may appear on its face to be inconsistent with our decision in *Hatchett*. When, however, a change occurs in the law upon which a prior decision rests, this Court must look afresh at the questioned provision. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 173, 109 S. Ct. 2363, 2370, 105 L. Ed. 2d 132, 148 (1989) ("In cases where statutory precedents have been overruled, the primary reason for the Court's shift in position has been the intervening development of the law, through either the growth of judicial doctrine or further action taken by Congress."), *superseded on other grounds by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (enacting 42 U.S.C. § 1981(b)), *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). Our decision in *Hatchett* was based on the fee schedule (which has remained largely unchanged) *and* the statutory language of former section 97-26. Under the statutory language at that time, an employer was liable for medical treatment "when ordered by the Commission." N.C.G.S. § 97-26 (1950). Our decision in *Hatchett* emphasized that statutory language: "G.S. 97-26 provides for the pecuniary liability of the employer for medical, surgical, hospital service or other treatment required, *when ordered by the Commission*." *Hatchett*, 240 N.C. at 594, 83 S.E.2d at 542. We reasoned that these "plain and explicit words" meant that the plaintiff's mother should not be compensated for her attendant care services because the Commission had not approved the care nor had the plaintiff asked for such an approval. *Id.* at 594, 83 S.E.2d at 542. It appears that we relied heavily on the

statutory language to determine that the Commission must be bound by its fee schedule. *Id.* However, in 1994 section 97-26 was completely rewritten, removing the "when ordered by the Commission" language and replacing it with language requiring the Commission to adopt fee schedules and outlining the procedures and standards for doing so. Ch. 679, sec 2.3, 1993 N.C. Sess. Laws at 397. Therefore, the statutory basis for the decision in *Hatchett* no longer exists, and, as stated above, no statutory basis exists for the current fee schedule.[1]

Nonetheless, we are unable to affirm the Commission's award of compensation for Mrs. Mehaffey's past attendant care services. As plaintiff concedes, to receive compensation for medical services, an injured worker is required to obtain approval from the Commission within a reasonable time after he selects a medical provider. *Schofield v. Great Atl. & Pac. Tea Co.*, 299 N.C. 582, 593, 264 S.E.2d 56, 63 (1980). If plaintiff did not seek approval within a reasonable time, he is not entitled to reimbursement. Here, defendants have challenged the reasonableness of the timing of plaintiff's request, and the opinion and award filed by the Full Commission does not contain the required findings and conclusions on this issue. Accordingly, we remand to the Court of Appeals for further remand to the Commission to make the necessary findings of fact and conclusions of law on this issue.

---

[1] Going forward, under the 2011 revisions to the Workers' Compensation Act, section 97-2(19) defines "Medical Compensation" to include "attendant care services prescribed by a health care provider authorized by the employer *or subsequently by the Commission*." N.C.G.S. § 97-2(19) (2011) (emphasis added).

The Court of Appeals reversed in pertinent part the opinion and award entered by the Full Commission, which provided retroactive compensation for Mrs. Mehaffey's attendant care services to her husband. Because that court relied on a provision of the Commission's Medical Fee Schedule that is not authorized by our legislature, we reverse the decision of the Court of Appeals on that issue. We remand this matter to the Court of Appeals for further remand to the Commission for additional proceedings consistent with this opinion.

REVERSED IN PART AND REMANDED.

Justice BEASLEY did not participate in the consideration or decision of this case.

Justice NEWBY dissenting in part and concurring in part.

"It is not debatable that the Workmen's Compensation Act is to be liberally construed to the end that the benefits thereof should not be denied upon technical, narrow and strict interpretation. The rule of liberal construction cannot be used to read into the Act a meaning alien to its plain and unmistakable words. We should not overstep the bounds of legislative intent, and make by judicial legislation our Workmen's Compensation Act an Accident and Health Insurance Act." *Hatchett v. Hitchcock Corp.*, 240 N.C. 591, 593, 83 S.E.2d 539, 541 (1954) (citations and internal quotation marks omitted). Through "judicial legislation" the majority has done just

that, expanding the potential liability owed by employers across our state. In so doing, the majority strikes down a reasonable attempt by the Industrial Commission to regulate costs that has existed for almost eighty years. The majority opinion circumvents the doctrine of stare decisis by "overstep[ping] the bounds of legislative intent," effectively overruling *Hatchett v. Hitchcock Corporation. Id.* Consequently, I must respectfully dissent in part.

According to the majority, an injured employee is entitled to compensation for unauthorized health care furnished by a family member despite a provision of the Industrial Commission's Medical Fee Schedule that explicitly requires preapproval. *Mehaffey v. Burger King*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (2013). The preapproval requirement is a long-established regulation designed to ensure predictability and to control medical costs while balancing employee access to care. Even so, the majority concludes that by the 1994 revisions to the Workers' Compensation Act, the General Assembly intended to remove the Commission's power to promulgate this historic prerequisite. *Id.* at ___, ___ S.E.2d at ___. Specifically, the majority relies on the elimination of the phrase "when ordered by the Commission" from section 97-26. That statute now states that the Medical Fee Schedule "shall be adequate to ensure that (i) injured workers are provided the standard of services and care intended by this Chapter, (ii) providers are reimbursed reasonable fees for providing these services, and (iii) medical costs are adequately contained." N.C.G.S. § 97-26(a) (2011). The 1994 revisions further instructed the

Commission to adopt "rules and guidelines" for the provision of "attendant care." *Id.* § 97-25.4(a) (2011). Those "rules and guidelines shall ensure that injured employees are provided the services and care intended by this Article and that medical costs are adequately contained." *Id.* Notwithstanding this explicit mandate to control costs, the majority holds that the 1994 revisions evidence a clear legislative intent to strip the authority of the Industrial Commission to require preapproval for familial care. *Mehaffey*, ___ N.C. at ___, ___ S.E.2d ___. I disagree.

As an administrative agency, the Commission "possesses only those powers expressly granted to it by our legislature or those which exist by necessary implication in a statutory grant of authority." *High Rock Lake Partners, LLC v. N.C. DOT*, 366 N.C. 315, 319, 735 S.E.2d 300, 303 (2012) (citation and quotation marks omitted). To determine the extent of an agency's power, "we apply the enabling legislation practically so that the agency's powers include all those the General Assembly intended the agency to exercise," and "[w]e give great weight to an agency's interpretation of a statute it is charged with administering." *Id.* (citations omitted). When reading such statutes, we also must consider legislative acquiescence; in other words, "[t]he failure of a legislature to amend a statute which has been interpreted by a court is some evidence that the legislature approves of the court's interpretation." *Young v. Woodall*, 343 N.C. 459, 462-63, 471 S.E.2d 357, 359 (1996); *see also State v. Ellison*, ___ N.C. ___, ___, 738 S.E.2d 161, 164 (2013) (approving of legislative acquiescence (citations omitted)).

*NEWBY, J., dissenting in part and concurring in part*

To ascertain the bounds of the Commission's authority, it is imperative to look at both the agency's enabling legislation as well as the long-standing interpretation it has given to those statutes. The Workers' Compensation Act generally provides health care for employees who sustain workplace injuries. N.C.G.S. §§ 97-1 to -101.1 (2011). Ratified in 1929, the Act sought to respond to the "ordinary hazards" implicit in "the substitution of the factory for the home as a place of labor and the introduction of power driven machinery with its vast complex of dangerous operations." N.C. Indus. Comm'n, *The North Carolina Workmen's Compensation Act*, Bull., May 1929, at 5-6 [hereinafter *Bulletin*]. Under the Act, an employee's right to compensation and an employer's resulting liability are predicated on "mutual concessions," in which "each surrenders rights and waives remedies" otherwise available under the law. *Lee v. Am. Enka Corp.*, 212 N.C. 455, 462, 193 S.E. 809, 812 (1937). The Act ensures that employees receive "prompt, reasonable compensation," but guarantees "limited and determinate liability for employers." *Radzisz v. Harley Davidson of Metrolina, Inc.*, 346 N.C. 84, 89, 484 S.E.2d 566, 569 (1997) (citations omitted).

When an employee seeks treatment from a professional health care provider, the Workers' Compensation Act applies in its simplest form. The care furnished comes at a cost, and the provider expects payment for the services rendered. A much more challenging situation occurs when the care is provided by an injured employee's immediate family. Unlike a professional health care provider, a family member does not create a bill or medical records as part of an ongoing business and is usually

expected to furnish a degree of uncompensated care.  At some point, however, that care reaches a threshold, surpassing that which is expected of normal familial duties.  But by its very nature, health care furnished by family members is difficult, if not impossible, to monitor and always invites the questions: When do the services cross the line from being merely part of the duties of a family to becoming compensable medical care?  And who decides?  This intersection tests the delicate balance between access to care and predictable medical costs, the foundation of the Workers' Compensation Act.

Early in its existence, the Industrial Commission, the state agency charged with administering the Workers' Compensation Act, enacted a series of safeguards designed to protect the financial well-being of those who must care for their loved ones following a workplace accident.  These safeguards likewise ensured that employers are not wrongfully burdened with paying for care that is implicitly part of the responsibilities of a family or, worse, fraudulent.  As the majority concedes, these procedural protections have "remained largely unchanged," *Mehaffey*, ___ N.C. at ___, ___ S.E.2d at ___, and consistent over the better part of the last century.

In the Act's infancy, the Fee Schedule was quite vague on this issue.  For example, in 1931 the Fee Schedule made no distinction for familial care, merely stating that "[c]harges for special nursing will be approved in those cases only where, and for such time as, the patient's condition actually requires such attention." *Bulletin*, Sept. 1931, at 9 (Medical and Hospital Fee Schedule).  Shortly thereafter,

the Commission began including language that reflected the difficulty in managing care furnished by an employee's immediate family. The first iterations of the preapproval requirement were not limited to family members alone, but included "any one" who acted as a practical nurse. In 1936, for instance, the Fee Schedule provided that "[f]ees for practical nursing service by a member of claimant's family or any one else will not be honored unless written authority has been obtained in advance." N.C. Indus. Comm'n, *Medical and Hospital Fee Schedule* 10 (1936).

The language of the 1945 Fee Schedule, at issue in *Hatchett*, was nearly identical, stating that "[f]ees for practical nursing service by a member of claimant's family or any one else will not be honored unless written authority has been obtained in advance." N.C. Indus. Comm'n, *Medical, Dental, Nursing and Hospital Fees* 15 (1945). Nonetheless, in *Hatchett* the Commission chose to ignore its own Fee Schedule and awarded financial compensation to an injured worker's mother for attendant care services that she provided to her son without prior approval from the Commission. 240 N.C. at 592-93, 83 S.E.2d at 540-41. On appeal, the defendants argued that the Fee Schedule controlled, prohibiting retroactive payments for the plaintiff's care. We agreed, striking down the award for lack of preapproval. *Id.* at 594-95, 83 S.E.2d at 542-43. This Court determined that the Fee Schedule, promulgated pursuant to the Commission's authority under the Workers' Compensation Act, prohibited such an award of compensation for a family member

providing attendant care services unless that conduct had been first approved by the Commission. *Id.* at 593-94, 83 S.E.2d at 541-42.

As the Fee Schedule was tested by different and unique fact patterns related to familial care, the Commission continued to fine-tune the provision's language. By 1958 the Commission omitted "any one" and introduced a degree of flexibility by adding the word "ordinarily." At that time the Fee Schedule required that "[f]ees for practical nursing service by a member of the immediate family of the injured person will not ordinarily be approved unless written authority for the rendition of such services for pay is first obtained from the Industrial Commission." N.C. Indus. Comm'n, *Medical, Dental, Nursing, and Hospital Fees* 28 (1958).

Following the legislature's 1994 revision of the Workers' Compensation Act that directed the Commission to adopt a Medical Fee Schedule that balances costs with access to care, the Commission again turned to the existing preapproval requirement, now section 14 of the Medical Fee Schedule. As it has for almost eighty years, that rule seeks to foster predictability and reduce the costs associated with home health care, stating that:

> When deemed urgent and necessary by the attending physician, special duty nurses may be employed. Such necessity must be stated in writing when more than seven days of nursing services are required.
>
> . . . .
>
> Except in unusual cases where the treating physician certifies it is required, fees for practical nursing services by members of

> the immediate family of the injured will not be approved unless written authority for the rendition of such services for pay is first obtained from the Industrial Commission.

N.C. Indus. Comm'n, *Medical Fee Schedule: Section 14* (2012). Therefore, according to the Commission's own terms, for a family member to receive payment for providing attendant care, the services generally must be preapproved in writing by the Commission. Yet, in keeping with the Workers' Compensation Act's mandate to ensure reasonable access to care, an injured employee may bypass Commission preapproval in unusual cases by first obtaining certification from the treating physician that the care provided by family members is required and then procuring the Commission's approval within a reasonable time, *see Mehaffey*, ___ N.C. at ___, ___ S.E.2d at ___ ("As plaintiff concedes, to receive compensation for medical services, an injured worker is required to obtain approval from the Commission within a reasonable time after he selects a medical provider." (citation omitted)). In either situation, however, the Fee Schedule fulfills the statutory directive of controlling costs and promoting predictability while leaving employees reasonable access to necessary care.

Like the Fee Schedule itself, the statutes undergirding the preapproval requirement have seen little change in the years since we decided *Hatchett*. For example, N.C.G.S. § 97-25, the statute upon which both the claims in this case and those in *Hatchett* are founded, generally reads the same, stating that compensation "shall be provided by the employer." *Compare* N.C.G.S. § 97-25 (1950), *with id.* § 97-

25 (2007). Further, when we decided *Hatchett* the relevant subsection of N.C.G.S. § 97-90 was nearly identical to its current version, reading that "no physician shall be entitled to collect fees from an employer or insurance carrier until he has made the reports required by the Industrial Commission in connection with the case." *Id.* § 97-90(a) (1950). That same statute now provides in part that "no physician or hospital or other medical facilities shall be entitled to collect fees from an employer or insurance carrier until he has made the reports required by the Commission in connection with the case." *Id.* § 97-90(a) (2011). Moreover, the Commission's rule making authority under N.C.G.S. § 97-80 has likewise withstood the test of time, requiring the agency to adopt rules consistent with the Workers' Compensation Act. *Compare id.* § 97-80(a) (2011) ("The Commission shall adopt rules, in accordance with Article 2A of Chapter 150B of the General Statutes and not inconsistent with this Article, for carrying out the provisions of this Article."), *with id.* § 97-80 (1950) ("The Commission may make rules, not inconsistent with this article, for carrying out the provisions of this article."). Consequently, the doctrine of stare decisis directs that our reasoning in *Hatchett* and our application of the Commission's Fee Schedule in that case control here.

Yet, attempting to distinguish *Hatchett* from the case at hand, the majority seizes upon the revision to N.C.G.S. § 97-26 to nullify the preapproval requirement. This result apparently relies solely on the General Assembly's later "removing" of the phrase "when ordered by the Commission," which was part of the statute when we

decided *Hatchett*. *Mehaffey*, ___ N.C. at ___, ___ S.E.2d at ___. Perhaps the majority's analysis would be reasonable if we were faced with a surgical extraction of these five words only, but in reality the entire statute, along with many other provisions of the Workers' Compensation Act, was revised in 1994. Though the language changed, the majority agrees that the statute's purpose remained intact: to "control medical costs" and to "enable employers more accurately to predict their potential financial exposure following an employee's injury." *Id.* at ___, ___ S.E.2d at ___. After further emphasizing that "[t]he adoption of a Medical Fee Schedule aids in fulfilling a purpose of the Act by indicating to employers the amount of their potential financial exposure," *id.* at ___, ___ S.E.2d at ___, why would the majority then strike down a specific provision that unequivocally was enacted with that purpose in mind?

The majority's mischaracterization of this revision to N.C.G.S. § 97-26 as evidence of legislative intent unreasonably parses a statute that previously interposed a sensible balance between access to care and cost containment. Now, the majority has effectively removed the cost containment provision. Striking the preapproval requirement, a proven method of ensuring "uniformity and predictability," *Mehaffey*, ___ N.C. at ___, ___ S.E.2d at ___, and guaranteeing that "medical costs are adequately contained," N.C.G.S. § 97-26(a), did not result from actions by our General Assembly. And, this Court should not pass judgment on policy. *See Home Sec. Life Ins. Co. v. McDonald*, 277 N.C. 275, 285, 177 S.E.2d 291, 298 (1970) (concluding that "questions as to public policy are for legislative

determination" (citation omitted)); *State v. Barksdale*, 181 N.C. 621, 626, 107 S.E. 505, 508 (1921) ("It is [the Court's role] to construe the laws and not to make them.").

Since first recognizing the challenge of managing home health care furnished by immediate family members, the Commission has interpreted the Workers' Compensation Act to allow the agency to require preapproval for such services. Nevertheless, the majority affords no weight to the Commission's interpretation—the Fee Schedule—which we approved in *Hatchett* and the General Assembly accepted for decades. If anything, the 1994 revisions to the Workers' Compensation Act actually bolstered the Commission's authority. An examination of the current version of section 97-26 makes clear that the power to require preapproval of these services is well within a practical reading of the legislature's mandate to adopt a Fee Schedule that ensures "(i) injured workers are provided the standard of services and care intended by this Chapter, (ii) providers are reimbursed reasonable fees for providing these services, and (iii) medical costs are adequately contained." N.C.G.S. § 97-26(a). Moreover, the extent of the Commission's authority is even more evident when considered in light of the long history of the preapproval requirement in conjunction with the plain and unambiguous language of section 97-25.4(a) instructing the Commission to adopt "rules and guidelines" for the provision of "attendant care" that "shall ensure that injured employees are provided the services and care intended by this Article and that medical costs are adequately contained." *Id.* § 97-25.4(a).

*NEWBY, J., dissenting in part and concurring in part*

As a result, I would hold that Section 14 of the Medical Fee Schedule is consistent with the current statutory scheme and that the Commission was thereby bound to apply it. Accordingly, for an employee to receive compensation for attendant care when provided by immediate family members, that employee must obtain either approval from the Commission before receiving treatment or, in unusual cases only, certification from the employee's treating physician that the care provided is required.

In this instance, the parties agree that plaintiff failed to obtain preapproval from the Commission before receiving attendant care from his wife. Thus, under its own Fee Schedule, the Commission should have denied plaintiff's reimbursement request unless this case presents an "unusual" situation and plaintiff's treating physician certified that the care furnished was required. Based on my review of the record, however, I am unable to make such a determination. I cannot determine, for example, why the Commission chose to depart from its own general requirements, whether the Commission believed this to be an "unusual" case, if plaintiff's treating physician certified plaintiff's wife's care was required, when such certification occurred, or if plaintiff sought Commission approval within a reasonable time. Most striking, the Commission's opinion and award ignores Section 14 of the Fee Schedule altogether, neither mentioning it nor alluding to its application to this case. Therefore, I would remand this matter to the Commission for further proceedings to consider application of the Fee Schedule and the preapproval requirement.

*NEWBY, J., dissenting in part and concurring in part*

The majority claims to "understand the difficulty in monitoring home health care, especially when furnished by a family member," yet removes the authority from the Commission to address this very real challenge. *Mehaffey*, ___ N.C. at ___, ___ S.E.2d at ___. In the name of construing a statute designed "to control medical costs," *id.* at ___, ___ S.E.2d at ___, the majority instead has increased significantly employers' exposure to potential liability. Because the majority's analysis runs afoul of one of the core aspirations of the Workers' Compensation Act—predictability—and because I believe our reasoning in *Hatchett* remains controlling, I respectfully dissent in part.

I concur with the majority's conclusion that "to receive compensation for medical services, an injured worker is required to obtain approval from the Commission within a reasonable time after he selects a medical provider." *Mehaffey*, ___ N.C. at ___, ___ S.E.2d at ___ (citation omitted).