IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-674

No. COA22-190

Filed 18 October 2022

Cumberland County, No. 20 JA 271

IN THE MATTER OF: D.S.

Appeal by respondent father from order entered 8 November 2021 by Judge

Luis J. Olivera in District Court, Cumberland County. Heard in the Court of Appeals

20 September 2022.

*Parent Defender Wendy C. Sotolongo, by Assistant Parent Defender Jacky Brammer, for respondent-father.*

*Parker Poe Adams & Bernstein LLP, by Eric H. Cottrell, for guardian ad litem.*

*Patrick A. Kuchyt, for appellee Cumberland County Department of Social Services.*

STROUD, Chief Judge.

Respondent Father appeals from an order adjudicating his infant son neglected and dependent. Father argues the trial court erred by adjudicating his son neglected because his son was not put at a substantial risk of harm by Respondent parents' conduct and the trial court failed to make findings of fact required to adjudicate his son neglected. Father also argues the trial court erred by adjudicating his son dependent because Father "presented an approved alternative caregiver pre-petition"

and the statutory requirements to adjudicate a juvenile dependent were unmet. Because the evidence and findings of fact do not support the trial court's conclusions of law, we reverse the trial court's adjudications of neglect and dependency.

## I.  Background

On 17 August 2020, Dallas[1] was born to Respondent Mother and Respondent Father.  Around the time of Dallas's birth Mother lived in Cumberland County and Father lived in Bladen County.  Shortly after Dallas was born both Mother and Dallas tested positive for THC, a metabolite of marijuana.  Dallas was also placed in the NICU due to low blood sugar before he was discharged from the hospital, and the Cumberland County Department of Social Services ("CCDSS") received a Child Protective Services referral the day after Dallas was born.  Ultimately, Mother agreed to place Dallas with Father after he was discharged from the hospital; after Dallas was discharged he lived with Father in Bladen County.

Approximately two weeks after Dallas was discharged from the hospital, on 2 September 2020, Social Worker V.C. contacted law enforcement in Bladen County and requested a "courtesy check" on Father and Dallas.  A Bladen County Sheriff's Office deputy assisted a Bladen County CPS social worker in performing the "courtesy check" on 2 September 2020 at approximately 6 p.m.  An Incident Report

---

[1] We use the pseudonym stipulated to by the parties.

filed by the deputy after the courtesy check stated the deputy first drove past Father's residence to confirm the address, and when the deputy drove by the residence the deputy "did see what appeared to be a black male standing in the yard." The deputy continued driving and waited at a nearby intersection for the social worker to arrive. "After approximately three minutes," the social worker arrived and the deputy "escorted her to the residence to attempt to make contact with" Father. The deputy knocked on the door of the residence twice, then walked around the side of the house when no one answered. The deputy "located a vehicle" and "was about to run the vehicle information to confirm if [the deputy and the social worker] were at the right address" when Father arrived. The deputy informed Father of the courtesy call, and Father allowed the deputy and social worker inside the residence to "observe[ ] a newborn infant sleeping in a crib." The social worker then contacted CCDSS and "made the decision to have the infant removed from the home." Father's cousin arrived at the residence and took Dallas to her home. The deputy estimated in the Incident Report that the deputy and social worker arrived at the residence "approximately five minutes" before Father. A case report filed by the Bladen County CPS social worker confirmed the deputy's recitation of the 2 September 2020 incident and also stated that Father asked the deputy while the deputy was in the home if the deputy saw Father "standing outside in the yard" when the deputy initially drove by. The deputy answered "he did see someone when he went by but that he could not tell

if" the person in the yard was Father.  The CPS document stated the social worker

estimated "there was about 7 minutes that there was no one home with the baby."

¶ 4     On 4 September 2020, CCDSS filed a petition alleging Dallas was a neglected

juvenile (1) because he "[did] not receive proper care, supervision, or discipline" from

Father and (2) because he "live[d] in an environment injurious to [his] welfare."  The

petition also alleged Dallas was a dependent juvenile because his "parent, guardian,

or custodian [was] unable to provide for the care or supervision of [Dallas] and

lack[ed] an appropriate alternative child care arrangement."  As to neglect the

petition alleged:

> 1.  The Cumberland County Department of Social Services (CCDSS) received a Child Protective Services (CPS) referral on 8/18/2020 concerning the safety of the juvenile.
>
> 2.  Respondent Mother has prior CPS history for neglect in September of 2019, due to substance abuse and unstable housing.
>
> 3.  Respondent Mother tested positive for THC when the child was born.  Respondent Mother initially refused for the minor child to be tested.  However, she later agreed, and he also tested positive for THC.
>
> 4.  The minor child was placed in the NICU due to low blood sugar.
>
> 5.  Respondent Mother indicated that she had appropriate housing and employment.  However, [Social Worker G.] has not been able to see the home or verify employment.
>
> 6.  Respondent Mother agreed to place the minor child with

Respondent Father upon his discharge from the hospital.

7. [Social Worker V.C.] contacted Bladen County on 9/2/2020 to ask for a courtesy check on the Respondent Father.

8. Law Enforcement for Bladen County arrived first, and no one was home. The [social worker] for Bladen County arrived several minutes later. A few minutes later the Respondent Father pulled into the yard.

9. [Bladen County social worker] asked Respondent Father where the minor child was, and he indicated that he was inside the home. Respondent Father went inside and retrieved the minor child. When asked who was with the minor child the Respondent Father indicated no one was with the minor child and that he was gone "30 seconds".

10. Based on the allegations herein, the juvenile(s) are at risk of imminent irreparable harm if they are returned to the physical custody of Respondents.

11. Based on the allegations herein, the Petitioner cannot ensure the safety of the juvenile(s) and is in need of a Non-Secure Custody Order in favor of the Petitioner.

The petition repeated identical allegations when alleging Dallas was a dependent juvenile.

On 4 September 2020, the Cumberland County District Court entered a nonsecure custody order in favor of CCDSS. Dallas was placed with a "suitable relative" pursuant to a "Temporary Safety Placement agreement" that Dallas's parents could remove him from "at any time without court involvement." The

nonsecure custody order did not identify that relative and the record does not contain the "Temporary Safety Placement agreement" referred to by the trial court. On 9 September 2020, the trial court held a review hearing and entered an order for continued nonsecure custody on 28 October 2020. The trial court incorporated the factual basis from the petition as alleged by CCDSS and concluded Dallas should remain in foster care while CCDSS attempted to find him an alternative placement. The order set a hearing on continued nonsecure custody for 14 September 2020. The case was heard on 14 September, Dallas remained in CCDSS custody, and an order was entered 23 October 2020. The trial court set the initial date for an adjudication hearing for 20 October 2020.

¶ 6     The adjudication hearing was repeatedly continued through 2020 and 2021.[2] During this time Father was incarcerated for 40 days for "assault[ing] a Cumberland County Sheriff's Deputy as they attempted to arrest him" for being disruptive during a hearing in this matter on 20 October 2020; Father completed a mental health

---

[2] There were significant delays between hearings in the District Court and the entry of orders in this case. The adjudication was continued after the 20 October 2020 hearing in an order entered 25 November 2020; after a 17 November 2020 hearing in an order entered 1 February 2021; after a 20 January 2021 hearing in an order entered 19 February 2021; after a 17 February 2021 hearing in an order entered 15 March 2021; after a 17 March 2021 hearing in an order entered 27 April 2021; after a 14 April 2021 hearing in an order entered 7 June 2021; after a 12 May 2021 hearing in an order with an illegible file stamp, signed on 23 August 2021; after a 9 June 2021 hearing in an order entered 1 September 2021 in which Judge Olivera was substituted for the previously presiding judge; and after a 14 July 2021 hearing in an order also entered 1 September 2021.

assessment and was later allowed visitation again; Mother was arrested; and Dallas was ultimately placed in foster care.[3]  Both CCDSS and Father filed motions for review; CCDSS filed its first motion on or about 1 March 2021 and its second motion approximately 4 June 2021.[4]  Father apparently filed his motion for review prior to the 9 June 2021 hearing but the record does not indicate this motion was ever heard by the trial court and the trial court's order does not address the motion.  CCDSS's first motion was granted after Mother's arrest and Dallas was removed from her home, CCDSS took a voluntary dismissal on its second motion at the 9 June 2021 hearing, and the record does not show whether Father's motion for review was ever ultimately heard or ruled upon by the trial court.

¶ 7          Almost one year after the filing of the petition, the adjudicatory hearing was finally held 17 August 2021 in Cumberland County District Court.[5]  The trial court

---

[3] The trial court's orders on continued nonsecure custody which continued the adjudicatory hearing in this case are not discussed in full here because the trial court did not incorporate these prior orders into its final Adjudication and Disposition Order.

[4] CCDSS's second motion for review and Father's motion for review are not in the record on appeal.  CCDSS's second motion is discussed in the trial court's 1 September 2021 order from the 9 June 2021 hearing.  Father's motion came up for hearing on both 9 June 2021 and again on 14 July 2021.  The trial court's orders for both of these hearing dates are dated 1 September 2021, and neither order addresses Father's motion for review.

[5] Our record does not provide any satisfactory reason for the delay of a year.  This hearing is required by law to be held within 60 days from the filing of the petition.  "(c) The adjudicatory hearing shall be held in the district at such time and place as the chief district court judge shall designate, but no later than 60 days from the filing of the petition unless the judge pursuant to G.S. 7B-803 orders that it be held at a later time."  N.C. Gen. Stat. § 7B-801 (2021) (effective 1 October 2011).  We note that the multiple continuances through

received stipulations of fact under North Carolina General Statute § 7B-807(a), as

stated in a written stipulation dated 21 July 2021:

1.  The Cumberland County Department of Social Services (CCDSS) received a Child Protective Services (CPS) referral on 8/18/2020 concerning the safety of the juvenile.

2.  Respondent Mother has prior CPS history for neglect in September of 2019, due to substance abuse and unstable housing. The Disposition for that case was heard on June 15, 2020; the Disposition Order was filed on July 14, 2020.

3.  Respondent Mother tested positive for THC when the child was born. Respondent Mother initially refused for the minor child to be tested. However, she later agreed, and he also tested positive for THC.

4.  The minor child was placed in the NICU due to low blood sugar.

5.  REMOVED.

6.  Respondent Mother agreed to place the minor child with Respondent Father upon his discharge from the hospital.

7.  [Social Worker V.C.] contacted Bladen County on 9/2/2020 to ask for a courtesy check on the Respondent

---

2020 appear based on North Carolina General Statute § 7B-506 (establishing procedures for continuing hearings on nonsecure custody), but none of the trial court's orders continuing the adjudication reference North Carolina General Statute § 7B-803, which governs continuances of adjudication hearings. *See* N.C. Gen. Stat. § 7B-803 (2021) (effective 1 October 2013) (allowing an adjudication hearing to be continued "for good cause . . . as long as is reasonably required to receive additional evidence, reports, or assessments . . . in the best interests of the juvenile . . . . Otherwise, continuances shall be granted only in extraordinary circumstances when necessary for the proper administration of justice or in the best interests of the juvenile.").

Father.

8. Bladen Co law enforcement arrived on the scene first. The Bladen County Social Worker arrived a few minutes later. They knocked on the door for a period of time, but no one came to the door. A few minutes later, Respondent Father pulled into the yard.

9. The Social Worker asked where the juvenile was; Respondent Father said that the juvenile was inside of the home. Law enforcement, the Social Worker, & Respondent Father went inside; law enforcement & the Social Worker observed the child in the room. When asked, Respondent Father said that the juvenile was under supervision & that Respondent Father was only gone "for 30 seconds." Neither law enforcement nor the Social Worker saw anyone else present in the home.

(Emphasis removed.) The stipulated facts were signed by the social worker, a CCDSS staff attorney, both parents, counsel for both parents, and the GAL attorney advocate. The stipulated facts do not include the date Dallas was discharged from the hospital after his birth on 17 August. In addition to the stipulated facts, the trial court also "accepted and incorporated into evidence" Father's Exhibit 1, comprised of the "Bladen County Incident Report" from the Bladen County Sheriff's Office, "Pictures of Respondent Father's home," and the "Bladen County Social Worker Dictation."

¶ 8        Aside from the findings on the stipulated facts and exhibits, the trial court's order made one additional substantive finding, apparently based upon the evidence submitted by Father for purposes of establishing a factual basis for the adjudicatory portion of the hearing:

10. On September 2, 2020, Deputy [ ] and a Bladen County Social Worker arrived at Respondent Father's residence. Respondent Father arrived approximately five (5) minutes after Deputy [ ] and the Bladen County Social Worker arrived. Once inside the residence, Deputy [ ] and the Bladen County Social Worker observed no one else to be in the home with the juvenile. Based on these findings, the Court finds that the juvenile was left unsupervised in Respondent Father's home.

Based solely upon these facts, the trial court adjudicated Dallas both neglected and dependent. The trial court entered an "Adjudication and Disposition Order" ("ADO"), (capitalization altered), on 8 November 2021 reflecting its findings from the adjudicatory hearing on 17 August 2021.[6] The trial court adopted the stipulated facts as findings of fact "by clear, cogent, and convincing evidence," and based upon these stipulated facts adjudicated Dallas "dependent and neglected as defined under 7B[,]" and moved on to the dispositional phase of the hearing. Based on the adjudicatory findings, the trial court concluded:

1. The evidence presented rises to the level of neglect pursuant to N.C. Gen. Stat. § 7B-101(15) in that the juvenile did not receive proper care, supervision, or

---

[6] We note the ADO was entered nearly 90 days after the hearing. "The order shall be reduced to writing, signed, and entered no later than 30 days following the completion of the hearing. If the order is not entered within 30 days following completion of the hearing, the clerk of court for juvenile matters shall schedule a subsequent hearing at the first session of court scheduled for the hearing of juvenile matters following the 30-day period to determine and explain the reason for the delay and to obtain any needed clarification as to the contents of the order. The order shall be entered within 10 days of the subsequent hearing required by this subsection." N.C. Gen. Stat. § 7B-807(b) (2021) (effective 1 October 2013).

discipline from their parent, guardian, custodian, or caretaker, and the juvenile lived in an environment injurious to their welfare due to: Respondent Mother's history of substance abuse, the juvenile and Respondent Mother testing positive for THC at the time of the juvenile's birth, and the juvenile being left unsupervised by Respondent Father. . . . .

2. The evidence presented rises to the level of dependency pursuant to N.C. Gen. Stat. § 7B-101(9) in that the juvenile's parent, guardian, or custodian is unable to provide for the care or supervision of the juvenile and lacks an appropriate alternative child care arrangement due to: Respondent Mother's history of substance abuse, the juvenile and Respondent Mother testing positive for THC at the time of the juvenile's birth, and the juvenile being left unsupervised by Respondent Father. . . .

. . .

4. The juvenile [Dallas] is a neglected juvenile within the meaning of N.C. Gen. Stat. § 7B-101(15), in that at the time of the filing of the Petition, the juvenile did not receive proper care, supervision, or discipline from their parent, guardian, custodian, or caretaker, and the juvenile lived in an environment injurious to their welfare.

5. The juvenile [Dallas] is a dependent juvenile within the meaning of N.C. Gen. Stat. § 7B-101(9) in that the juvenile's parent, guardian, or custodian is unable to provide for the care or supervision of the juvenile and lacks an appropriate alternative childcare arrangement.

¶ 10    Father appealed and only challenges the adjudicatory portion of the ADO.

Mother did not appeal.

## II.     Jurisdiction

The ADO is a final judgment appealable by right.  N.C. Gen. Stat. § 7A-27(b)(2) (2021) (effective 1 July 2021) ("[A]ppeal lies of right directly to the Court of Appeals in any of the following cases: . . . (2) From any final judgment of a district court in a civil action.); N.C. Gen. Stat. § 7B-1001(a)(3) (2021) (effective 1 October 2021) ("In a juvenile matter under [Subchapter 1. Abuse, Neglect, Dependency], only the following final orders may be appealed directly to the Court of Appeals: . . . (3) Any initial order of disposition and the adjudication order upon which it is based.").  The ADO was filed 8 November 2021 and Father timely filed his Notice of Appeal on 8 December 2021, but the Certificate of Service for Father's Notice of Appeal was filed on 20 December 2021 and shows the Notice of Appeal was untimely served on 15 December 2021.  *See* N.C. R. App. P. 3.1(b) (requiring a notice of appeal to conform with N.C. Gen. Stat. § 7B-1001); N.C. Gen. Stat. § 1A-1, Rule 5 (2021).

Father filed a Petition for Writ of Certiorari pursuant to Rule 21 acknowledging his "right to prosecute an appeal has been lost by failure to take timely action."  Neither CCDSS or the Guardian ad litem filed a response to Father's PWC. We exercise our discretion and grant Father's petition.  *See* N.C. R. App. P. 21; *State v. Gardner*, 225 N.C. App. 161, 165, 736 S.E.2d 826, 829 (2013).

## III.     Standard of Review

Father alleges the trial court erred by adjudicating Dallas neglected and

dependent because the findings of fact do not support the trial court's conclusions as

to neglect and dependency.

> In North Carolina, juvenile abuse, neglect, and dependency
> actions are governed by Chapter 7B of the General
> Statutes, commonly known as the Juvenile Code. Such
> cases are typically initiated when the local department of
> social services (DSS) receives a report indicating a child
> may be in need of protective services. *See* N.C.G.S. §§ 7B–
> 301, –302 (2005). DSS conducts an investigation, and if the
> allegations in the report are substantiated, it files a
> petition in district court alleging abuse, dependency, or
> neglect. *See Id.* §§ 7B–302, –400, –403 (2005). The first
> stage in such proceedings is the adjudicatory hearing. *See*
> *Id.* § 7B–807 (2005). If DSS presents clear and convincing
> evidence of the allegations in the petition, the trial court
> will adjudicate the child as an abused, neglected, or
> dependent juvenile. *Id.* § 7B–807(a). If the allegations in
> the petition are not proven, the trial court will dismiss the
> petition with prejudice and, if the juvenile is in DSS
> custody, returns the juvenile to the parents. *Id.*

*In re A.K.*, 360 N.C. 449, 454-55, 628 S.E.2d 753, 756-57 (2006). "The role of this

Court in reviewing a trial court's adjudication of neglect and [dependency] is to

determine '(1) whether the findings of fact are supported by "clear and convincing

evidence," and (2) whether the legal conclusions are supported by the findings of

fact[.]'" *In re T.H.T.*, 185 N.C. App. 337, 343, 648 S.E.2d 519, 523 (2007) (quoting *In*

*re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000)). "Clear and

convincing evidence is evidence which should fully convince. Whether a child is

[neglected or] dependent is a conclusion of law, and we review a trial court's

conclusions of law de novo." *In re N.K.*, 274 N.C. App. 5, 8, 851 S.E.2d 389, 392 (2020) (quoting *In re M.H.*, [272] N.C. App. [283], [286], 845 S.E.2d 908, 911 (2020)).

## IV.   Adjudication

### A.  Neglect

¶ 14    Father argues "[t]he adjudicatory evidence and findings raise two possible concerns[,]" that Dallas was left alone for five minutes and Mother tested positive for THC at Dallas's birth, and "[t]aken together, both concerns are insufficient as a matter of law to support a neglect adjudication."

¶ 15    When the petition was filed, North Carolina General Statute § 7B-101(15) defined a neglected juvenile as:

> Any juvenile less than 18 years of age (i) who is found to be a minor victim of human trafficking under G.S. 14-43.15 or (ii) whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare . . . .  In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home . . . where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C. Gen. Stat. § 7B-101(15) (2021) (effective 1 December 2019 to 30 September 2021).  Our courts have expanded upon § 7B-101(15):

> "Rather, in concluding that a juvenile 'lives in an environment injurious to the juvenile's welfare,' N.C.G.S. § 7B-101(15), the clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile." *Id.* Indeed,  our  Courts  have  "additionally

'required that there be some physical, mental, or emotional impairment of the juvenile *or a substantial risk of such impairment* as a consequence of the failure to provide "proper care, supervision, or discipline" ' in order to adjudicate a juvenile neglected." *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997) (quoting *In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901–02 (1993)) (emphasis in original).

*In re G.C.*, 2022-NCCOA-452, ¶ 15.   "This Court has also stated, however, '[w]here there is no finding that the juvenile has been impaired or is at substantial risk of impairment, there is no error if all the evidence supports such a finding."  *In re B.P.*, 257 N.C. App. 424, 433, 809 S.E.2d 914, 919 (2018) (quoting *In re Padgett*, 156 N.C. App. 644, 648, 577 S.E.2d 337, 340 (2003)).

As to Mother's prior CPS involvement, this Court has noted that prior closed cases, standing alone, cannot support a new adjudication of neglect as to another child:

> "[A] prior and closed case with other children . . . *standing alone*, cannot support an adjudication of current or future neglect." *In re J.A.M.*[,] 372 N.C. [1, ] 9, 822 S.E.2d [693, ] 699 [(2019)] (internal quotations omitted) (citation omitted) (emphasis in original). "Instead, we 'require[ ] the presence of other factors to suggest that the neglect or abuse will be repeated.' " *Id.* at 9–10, 822 S.E.2d at 699 (quoting *In re J.C.B.*, 233 N.C. App. 641, 644, 757 S.E.2d 487, 489 (2014)).

> Likewise, this Court has recognized that in determining whether a juvenile is neglected based on prior abuse or neglect of other children by an adult who regularly lives in the home: "The decision of the trial court regarding

whether the other children in the home are neglected, 'must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case.' " *In re S.M.L.*, 272 N.C. App. 499, 515, 846 S.E.2d 790, 801 (2020) (quoting *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999)). "*If the trial court relies on instances of past abuse or neglect of other children in adjudicating a child neglected*, the court is required to find 'the presence of other factors to suggest that the neglect or abuse will be repeated.' " *Id.* at 516, 846 S.E.2d at 801 (quoting *In re J.C.B.*, 233 N.C. App. 641, 644, 757 S.E.2d 487, 489 (2014)).

*In re G.C.*, ¶¶ 15-16 (emphasis in second paragraph added).

¶ 17 Father stipulated to the adjudicatory facts and does not specifically challenge any finding of fact; the findings are therefore binding on appeal. *In re R.S.*, 254 N.C. App. 678, 680, 802 S.E.2d 169, 171 (2017) ("Uncontested findings of fact are 'presumed to be supported by competent evidence and [are] binding on appeal.'" (quoting *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991))). We review the trial court's conclusions *de novo* to determine if they are supported by the trial court's findings of fact. *See In re T.H.T.*, 185 N.C. App. at 343, 648 S.E.2d at 523; *In re M.H.*, 272 N.C. App. at 286, 845 S.E.2d at 911.

¶ 18 The trial court accepted the stipulation, *see generally* N.C. Gen. Stat. § 7B-807(a) (2021) (establishing requirements for a trial court to utilize stipulated facts in an adjudicatory hearing), and found:

[*8*]*a. The Cumberland County Department of Social*

*Services (CCDSS) received a Child Protective Services (CPS) referral on 8/18/2020 concerning the safety of the juvenile.*

*[8]b. Respondent Mother has prior CPS history for neglect in September of 2019, due to substance abuse and unstable housing. The disposition for that case was heard on June 15, 2020, and the dispositional order was filed on July 14, 2020.*

*[8]c. Respondent Mother tested positive for THC when the child was born. Respondent Mother initially refused for the minor child to be tested. However, she later agreed, and he also tested positive for THC.*

*[8]d. The minor child was placed in the NICU due to low blood sugar.*

*[8]e. Respondent Mother agreed to place the minor child with Respondent Father upon his discharge from the hospital.*

*[8]f. [Social Worker V.C.] contacted Bladen County on 9/2/2020 to ask for a courtesy check on Respondent Father.*

*[8]g. Bladen County Law Enforcement arrived [at Father's residence] first and a Bladen County Social Worker arrived a few minutes later. They knocked at the door for a period of time, but no one came to the door. A few minutes later Respondent Father pulled into the yard.*

*[8]h. [The Social Worker] asked Respondent Father where the minor child was, and he indicated that he was inside the home. Law Enforcement, the Social Worker, and Respondent Father went inside. Law Enforcement and the Social Worker observed the juvenile in his room. When asked who was with the minor child the Respondent Father indicated the juvenile was under supervision and that Respondent Father was only gone for thirty seconds. Neither law enforcement nor the Social Worker saw anyone*

*else present in the home at that time.*

(Original italics and formatting altered.)  The trial court also found Father arrived at the home "approximately five (5) minutes" after the Bladen County deputy and social worker.  The trial court then concluded:

> 1. The evidence presented rises to the level of neglect pursuant to N.C. Gen. Stat. § 7B-101(15) in that the juvenile did not receive proper care, supervision, or discipline from their parent, guardian, custodian, or caretaker, and the juvenile lived in an environment injurious to their welfare due to: Respondent Mother's history of substance abuse, the juvenile and Respondent Mother testing positive for THC at the time of the juvenile's birth, and the juvenile being left unsupervised by Respondent Father.  Therefore, the juvenile is a neglected juvenile within the meaning of N.C. Gen. Stat. § 7B-101(15).
>
> . . .
>
> 4. The juvenile [Dallas] is a neglected juvenile within the meaning of N.C. Gen. Stat. § 7B-101(15), in that at the time of the filing of the Petition, the juvenile did not receive proper care, supervision, or discipline from their parent, guardian, custodian, or caretaker, and the juvenile lived in an environment injurious to their welfare.

¶ 19      The trial court's findings of fact do not support its conclusions of law.  Finding 8(b) does not support the court's conclusions Dallas was neglected for several reasons.  First, the stipulations did not address when the prior DSS involvement with Mother began or what happened, other than the general reference to substance abuse and unstable housing.   The trial court's findings do not address "'the presence of other

factors to suggest that the neglect or abuse'" from Mother's prior case would be repeated, and the court did not "assess whether there is a substantial risk of future abuse or neglect of [Dallas] based on the historical facts of [that] case." *See In re G.C.*, ¶ 16 (quotation omitted). Upon his release from the hospital after his birth, Dallas was placed with Father, with DSS's knowledge, and not with Mother, because both she and Dallas tested positive for THC. There was no indication of prior DSS involvement or drug use as to Father; instead, Dallas went home with Father when he was released from the hospital.

¶ 20 Assuming Findings 8(c) and 8(d) are true and accurate, as we must, the trial court does not show how these findings constitute "some physical, mental, or emotional impairment of the juvenile or" how these findings present "a substantial risk of such impairment as a consequence of the failure to provide 'proper care, supervision, or discipline'" of Dallas as to render his environment "injurious to [his] welfare." *See id.*, ¶ 15 (emphasis removed); N.C. Gen. Stat. § 7B-101(15). The trial court simply states that both Mother and Dallas tested positive for THC and that Dallas had low blood sugar at birth. There is no finding of any relationship between low blood sugar at birth and the positive THC test, nor how a low blood sugar level at birth is relevant to the child's condition months later, nor how a low blood sugar level months prior to the petition created a "substantial risk of such impairment" at the time the petition was filed. Nor do these findings show that Mother "[d]oes not

provide proper care, supervision, or discipline" to Dallas or that Dallas lives in an "environment injurious to [his] welfare." N.C. Gen. Stat. § 7B-101(15). The trial court must find that there were "current circumstances" that rendered Dallas's environment unsafe, *see In re G.C.*, ¶ 15, and there is a logical step missing from the trial court's findings. Additionally, when we review "all the evidence" that might support a finding Dallas was impaired or at substantial risk of impairment, *see In re B.P.*, 257 N.C. App. at 433, 809 S.E.2d at 919, the evidence does not support such a finding. The sum of the evidence regarding Mother's drug use and Dallas's low blood sugar was as recited in the trial court's findings; there is no additional adjudicatory evidence showing Dallas was at any further risk of harm from Mother's prior drug use after he was discharged from the hospital and placed in Father's care. The adjudicatory evidence is instead limited to these stipulations and the incident on 2 September 2020 when Dallas was briefly left alone by Father, which we address in greater detail below.[7] Findings 8(b), 8(c), and 8(d) do not support the court's conclusion Dallas was a neglected juvenile.

¶ 21     Findings 8(g) and 8(h) are the only findings relevant to Father's actions. These

---

[7] The trial court's prior orders indicate Mother drove with Dallas while possibly inebriated and injured a law enforcement officer when the officer attempted to take possession of Dallas on 24 February 2021. However, the trial court did not incorporate any of its prior orders for adjudicatory purposes. The court only found "The facts as admitted by the parties, constitute the factual basis for this adjudication . . . ."

address the 2 September 2020 incident when Dallas was left unattended in his crib at Father's home for "approximately five (5) minutes." As to whether Findings 8(g) and 8(h) support the trial court's conclusion that Dallas was neglected, both Father and the guardian ad litem discuss this Court's decision in *In re D.C.*, 183 N.C. App. 344, 644 S.E.2d 640 (2007), in which the trial court adjudicated a child neglected after her mother left her alone in a hotel room for at least 30 minutes. *See id.* at 351-52, 644 S.E.2d at 644. When her child was "approximately sixteen months old, [the mother] left [the child] unsupervised in a motel room where she was later found by a motel employee." *Id.* at 347, 644 S.E.2d at 641. An employee entered the mother's motel room after other motel guests reported the child had been "crying continuously" and found the child alone. *Id.* The motel employee contacted the police, and the mother returned after the police arrived and stated "she had been gone for only ten or fifteen minutes." *Id.* DSS took nonsecure custody of the child and filed a petition alleging the child was neglected; the trial court later adjudicated the child and her sibling neglected. *Id.* at 347-48, 644 S.E.2d at 641-42.

¶ 22    This Court held the motel incident, alongside "numerous additional findings[,]" proved by clear and convincing evidence, could "support [the trial court's] conclusion that [the child] is a neglected juvenile as defined by N.C. Gen. Stat. § 7B-101(15)." *Id.* at 351, 644 S.E.2d at 644. In *In re D.C.*, there was clear and convincing evidence the mother left the child at the motel. A hotel clerk testified he found the child

"sitting alone on the floor beside the door crying[,]" and "approximately thirty minutes elapsed between the time he received the complaint and the time he called the police[,] [and] [the mother] did not return to the motel before the police arrived." *Id.* at 351-52, 644 S.E.2d at 644. The incident also occurred at approximately 4 a.m. *Id.* at 353, 644 S.E.2d at 645. The trial court made four findings detailing the incident, and this Court found the findings supported the conclusion the child was neglected because the child was exposed to "an injurious environment that put [her] in an unacceptable risk of harm and emotional distress." *Id.* (alteration in original).

¶ 23       This case is distinguishable from *In re D.C.* Here, the stipulated facts indicate Dallas was alone, sleeping in his crib at his Father's home, for a very brief period of time. The trial court found "Respondent Father arrived approximately five (5) minutes after" the Bladen County deputy and social worker arrived. The five-minute period Dallas was unsupervised is notably less than the 30-minute period testified to by the clerk in *In re D.C.* Additionally, the child in *In re D.C.* was left in a hotel room at 4:00 a.m., not her own crib at home in the early evening. At 16 months old, the child in *In re D.C.* was capable of exploring and encountering various hazards and was in significant distress when she was found by the front desk clerk. *See id.* at 351, 644 S.E.2d at 644 ("When [the clerk] entered room 214 he found [the child] sitting alone on the floor beside the door crying."). Here, the stipulated facts state the Bladen County deputy and social worker simply "observed the child in the room." There is

no indication Dallas was in distress or in circumstances where he may be subject to risk from being left alone for five minutes. The trial court did not make any finding that Dallas was impaired or disturbed by his Father's brief absence, unlike the child in *In re D.C.* The trial court also did not make any finding that Dallas was at a "substantial risk of harm" as a consequence of Father's brief absence, *see In re G.C.*, ¶ 15; the court's Finding 10 merely states Dallas was "left unsupervised." Indeed, based upon the stipulations and other adjudicatory evidence, there is no indication Dallas was at any more risk than he would have been if Father were sleeping in another room of the house. The trial court's Findings 8(g), 8(h), and 10 do not support its conclusions that Dallas was a neglected juvenile.

¶ 24          CCDSS, relying on N.C. Gen. Stat. § 14-318 (2021) (establishing a Class 1 misdemeanor for leaving a child under 8 years old alone while confined in a building or dwelling due to the potential risk of exposing the child to fire), argues it "would be reasonable to conclude that leaving a juvenile under the age of eight (8) in a home unsupervised is *per se* neglect when taking into account the criminal statute. Therefore, the trial court properly concluded that Dallas received improper supervision and was exposed to a substantial risk of harm." This argument is not persuasive. First, CCDSS did not make this argument before the trial court. On appeal, CCDSS argues we should use the criminal statutes to define what constitutes neglect of a juvenile, but the definition of neglect is provided by North Carolina

General Statute § 7B-101(15). Certainly, evidence of the actual commission of a crime involving a child may be relevant to an adjudication of neglect or dependency, but CCDSS's argument here is merely hypothetical. The purpose of Chapter 7B is to "provide procedures for the hearing of juvenile cases," to "develop a disposition in each juvenile case that reflects consideration of the facts," to protect juveniles by means that respect traditional family rights, to "provide standards for the removal, *when necessary*, of juveniles from their homes . . . consistent with *preventing the unnecessary or inappropriate separation of juveniles from their parents*," and to "provide standards . . . ensuring that the best interests of the juvenile are of paramount consideration by the court . . . ." N.C. Gen. Stat. § 7B-100 (2021) (emphasis added). Section 14-318 does not establish standards applicable to juvenile proceedings under Chapter 7B, and we do not read § 7B-101(15) to require the use of criminal statutes to define neglect because our General Assembly has expressly divided the two without reference to each other. To illustrate, § 7B-101(1) extensively utilizes General Statutes Chapter 14 to define "abused juveniles," but § 7B-101(15) does not reference any section of Chapter 14 other than § 14-43.15 (establishing child trafficking as grounds for neglect), which is inapplicable here. *See generally* N.C. Gen. Stat. § 7B-101. We see no reason to link two distinct Chapters of our General Statutes when our legislature intentionally drafted § 7B-101(15) without reference to Chapter 14 when it easily could have chosen to, particularly where this connection

was first argued on appeal. *See Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) ("The principal goal of statutory construction is to accomplish the legislative intent.").

Second, Father asserts, and we agree, that a *per se* rule of neglect as proposed by CCDSS would result in harsh, undesirable consequences. Under CCDSS's proposed *per se* rule even a moment's lack of supervision could result in an adjudication of neglect under Chapter 7B every time a juvenile's parent or parents stepped outside for a few minutes to check the mail, let out a pet dog, or bring in the groceries from the car. Such a rule is directly contrary to the purpose of Chapter 7B as described in § 7B-100, "[t]o provide standards for the removal, *when necessary*, of juveniles from their homes and for the return of juveniles to their homes consistent with *preventing the unnecessary or inappropriate separation of juveniles from their parents*." N.C. Gen. Stat. § 7B-100 (emphasis added). CCDSS's proposed rule would result in "neglect" every time a juvenile's parent steps out of the home to complete the most minimal of household tasks, even if the child is left safely sleeping in his crib. "[W]here a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." *Mazda Motors of America, Inc. v. Southwestern Motors, Inc.*, 296 N.C. 357, 361, 250 S.E.2d 250, 253 (1979) (quoting *State v. Barksdale*, 181 N.C.

621, 107 S.E. 505 (1921)). Chapter 7B is not intended to punish parents; it is intended to ensure the wellbeing of juveniles. *See In re Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984) (holding, in a termination of parental rights case, "In determining whether a child is neglected, the determinative factors are the circumstances and conditions surrounding the child, *not the fault or culpability of the parent*." (emphasis added)).

¶ 26        The trial court's findings do not support its conclusions that Dallas was neglected. The findings do not establish Father did not provide "proper care, supervision, or discipline" to Dallas or that Dallas "lives in an environment injurious to [his] welfare[.]" N.C. Gen. Stat. § 7B-101(15). The findings at most support the conclusion that Dallas's Mother had a prior substance abuse problem and Dallas was exposed to THC during the pregnancy, but Dallas was then discharged from the hospital into Father's care. There are no findings that Father's home was inappropriate in any way and no findings of substance abuse by Father. Instead, Dallas was left unattended for "approximately five (5) minutes" in his own home and nothing more. We decline to adopt CCDSS's proposed *per se* rule as to juvenile neglect based upon a child being left unsupervised in a safe place in his own home for five minutes because it is inconsistent with the purposes of Chapter 7B. The portion of the order adjudicating Dallas neglected is reversed.

**B. Dependency**

Father also challenges the trial court's adjudication of Dallas as a dependent juvenile. Again, the trial court's findings of fact do not support its conclusions adjudicating Dallas dependent.

A dependent juvenile is "in need of assistance or placement because (i) the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or (ii) the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9) (2021) (effective 1 December 2019 to 30 September 2021). "In determining whether a juvenile is dependent, the trial court must address *both* (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative childcare arrangements." *In re Q.M.*, 275 N.C. App. 34, 38-39, 852 S.E.2d 687, 691 (2020) (emphasis in original) (quoting *In re T.B., C.P., & I.P.*, 203 N.C. App. 497, 500, 692 S.E.2d 182, 184 (2010)). "Findings of fact addressing both prongs must be made before a juvenile may be adjudicated as dependent, and the court's failure to make these findings will result in reversal of the court." *Id.* at 42, 852 S.E.2d at 693. "'Moreover, although N.C.G.S. § 7B-101(9) uses the singular word "the [ ] parent" when defining whether "the [ ] parent" can provide or arrange for adequate care and supervision of a child, our caselaw has held that a child cannot be adjudicated dependent where she has at least "a parent" capable of

doing so.'" *Id.* (quoting *In re V.B.*, 239 N.C. App. [340, ] 342, 768 S.E.2d [867, ] 868 [(2015)]).

¶ 29        Father again does not challenge any specific findings of fact. Father raises general arguments that "the adjudicatory evidence and the court's findings" do not support its conclusions. The trial court's conclusions of law must be supported by its findings of fact. *See id.* The trial court's findings are binding on appeal, *see In re R.S.*, 254 N.C. App. at 680, 802 S.E.2d at 171; *Koufman* 330 N.C. at 97, 408 S.E.2d at 731 ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal."), and thus we address whether the trial court's conclusions are supported by the findings.

¶ 30        The trial court's conclusions as to dependency state:

> 2. The evidence presented rises to the level of dependency pursuant to N.C. Gen. Stat. § 7B-101(9) in that the juvenile's parent, guardian, or custodian is unable to provide for the care or supervision of the juvenile and lacks an appropriate alternative child care arrangement due to: Respondent Mother's history of substance abuse, the juvenile and Respondent Mother testing positive for THC at the time of the juvenile's birth, and the juvenile being left unsupervised by Respondent Father. Therefore, the Court finds that the juvenile is dependent within the meaning of N.C. Gen. Stat. § 7B-101(9).
>
> . . .
>
> 5. The juvenile [Dallas] is a dependent juvenile within the meaning of N.C. Gen. Stat. § 7B-101(9) in that the

> juvenile's parent, guardian, or custodian is unable to
> provide for the care or supervision of the juvenile and
> lacks an appropriate alternative childcare
> arrangement.

The trial court repeats the same findings to support its conclusions Dallas was

dependent as it did to support its conclusions that Dallas was neglected.

These findings do not address the requirements of North Carolina General Statute §

7B-101(9), and do not support the trial court's conclusions. *See In re Q.M.*, 275 N.C.

App. at 38-39, 852 S.E.2d at 691 ("In determining whether a juvenile is dependent,

the trial court must address *both* (1) the parent's ability to provide care or

supervision, and (2) the availability to the parent of alternative childcare

arrangements.").

¶ 31        The trial court's findings recite that Mother had prior CPS history, she and

Dallas tested positive for THC at Dallas's birth, Dallas was placed in the NICU

because he had low blood sugar, and that after Dallas was discharged from the

hospital Father briefly left the home at the same time a courtesy check was made by

a Bladen County deputy and social worker. These findings show Mother was not

capable of providing care for Dallas when he was discharged from the hospital, but

she did have an appropriate "alternative childcare arrangement": Father. Dallas was

discharged into his care. The only finding regarding Father is that he left Dallas

alone in his crib for "five minutes." There was no indication his home was

inappropriate or that Father had not provided proper care for Dallas since his release from the hospital. There was no indication Dallas was subjected to any risk from the five minutes alone in his room. We do not suggest a parent should leave a newborn alone in the home for any particular period of time, but under the minimal facts as stipulated here, these findings do not establish both of Dallas's parents (1) were incapable of providing care or supervision to Dallas and (2) lacked appropriate alternative childcare arrangements. *See* N.C. Gen. Stat. § 7B-101(9); *In re Q.M.*, 275 N.C. App. at 38-39, 852 S.E.2d at 691.

> A review of the adjudication and disposition order entered in the instant case reveals that the court failed to make any findings regarding *the availability to the parent of alternative child care arrangements*. Where previous case law makes clear that such a finding is required, we must reverse the lower court as to the finding and conclusion that [Dallas] is a [neglected and] dependent juvenile . . . .

*In re B.M.*, 183 N.C. App. 84, 90, 643 S.E.2d 644, 648 (2007) (emphasis added). Because the findings do not establish either prong required by N.C. General Statute § 7B-101(9) and our case law, where they must address both, *see In re Q.M.*, 275 N.C. App. at 38-39, 852 SE.2d at 691, the trial court's conclusions adjudicating Dallas dependent are unsupported and must be reversed. *See id.* at 42, 852 S.E.2d at 693-94.

## V.    Disposition

Because we reverse the adjudicatory portion of the trial court's ADO, there is

no legal basis for disposition and we must also necessarily vacate the dispositional portion. *See id.* at 42-43, 852 S.E.2d at 694 (citing *In re S.C.R.*, 217 N.C. App. 166, 170, 718 S.E.2d 709, 713 (2011)).

## VI. Conclusion

We conclude the trial court's findings do not support its conclusions adjudicating Dallas neglected and dependent. We reverse the trial court's conclusions in the ADO as to the adjudications of neglect and dependency of Dallas. The trial court's findings were inadequate to establish Dallas neglected under § 7B-101(15) or dependent as defined by § 7B-101(9). The adjudicatory portion of the ADO is reversed, and the dispositional portion of the ADO is necessarily vacated.

REVERSED IN PART; VACATED IN PART.

Judges ZACHARY and MURPHY concur.